## UNITED STATES *v.* LOUISIANA ET AL.

No. 10, Original.  Argued October 12–15, 1959.—
Decided May 31, 1960.

2

*Solicitor General Rankin* and *George S. Swarth* argued the cause for the United States. With them on the brief were *Oscar H. Davis* and *John F. Davis.*

*Price Daniel,* Governor of Texas, *Will Wilson,* Attorney General, *James P. Hart* and *J. Chrys Dougherty* argued the cause for the State of Texas, defendant. With them on the brief were *James N. Ludlum,* First Assistant Attorney General, *Houghton Brownlee, Jr., James H. Rogers, Wallace B. Clift, Jr., Neal R. Allen, John Flowers* and *Robert T. Lewis,* Assistant Attorneys General, and *Robert J. Hearon, Jr.*

4

*Jack P. F. Gremillion,* Attorney General of Louisiana, and *Victor A. Sachse,* Special Assistant Attorney General, argued the cause for the State of Louisiana, defendant. With them on the brief were *W. Scott Wilkinson, Edward M. Carmouche, John L. Madden* and *Bailey Walsh,* Special Assistant Attorneys General, and *Hugh M. Wilkinson* and *Marc Dupuy, Jr.*

*Joe T. Patterson,* Attorney General of Mississippi, and *John H. Price, Jr.,* Assistant Attorney General, argued the cause and filed a brief for the State of Mississippi, defendant.

*Gordon Madison,* Assistant Attorney General of Alabama, argued the cause for the State of Alabama, defendant. With him on the brief were *John Patterson,* Attorney General of Alabama, *William G. O'Rear,* Assistant Attorney General, *E. K. Hanby,* Special Assistant Attorney General, *E. C. Boswell* and *Neil Metcalf.*

*Senator Spessard L. Holland* and *Richard W. Ervin,* Attorney General of Florida, argued the cause for the State of Florida, defendant. With them on the brief were *J. Robert McClure,* First Assistant Attorney General of Florida, and *Fred M. Burns, Robert J. Kelly* and *Irving B. Levenson,* Assistant Attorneys General.

*Jack P. F. Gremillion,* Attorney General of Louisiana, *Will Wilson,* Attorney General of Texas, *Joe T. Patterson,* Attorney General of Mississippi, *John Patterson,* Attorney General of Alabama, and *Richard W. Ervin,* Attorney General of Florida, were also on a joint brief for the defendant States.

Mr. Justice Harlan delivered the opinion of the Court.

The United States, invoking our original jurisdiction under Art. III, § 2, of the Constitution, brought this suit against the States of Louisiana, Texas, Mississippi, Ala-

bama, and Florida, seeking a declaration that it is entitled to exclusive possession of, and full dominion and power over, the lands, minerals, and other natural resources underlying the waters of the Gulf of Mexico more than *three geographical miles* seaward from the coast of each State and extending to the edge of the Continental Shelf.[1] The complaint also asks that the States be enjoined from interfering with the rights of the United States in that area, and that they be required to account for all sums of money derived by them therefrom since June 5, 1950.[2] The case is now before us on the motions of the United States for judgment on the pleadings and for dismissal of Alabama's cross bill seeking to establish its rights to such submerged lands and resources within *three marine leagues* of its coast.

The controversy is another phase of the more than 20 years' dispute between the coastal States and the Federal Government over their respective rights to exploit the oil and other natural resources of offshore submerged lands. In 1947 this Court held that, as against California, the United States possessed paramount rights in such lands underlying the Pacific Ocean seaward of the low-water mark on the coast of California and outside of inland waters. *United States* v. *California,* 332 U. S. 19, 804. And on June 5, 1950, the Court, following the principles announced in the *California* case, made like holdings with respect to submerged lands in the Gulf of Mexico similarly lying off the coasts of Louisiana and Texas, and directed both States to account to the United States for all sums derived from natural resources in those areas after that date. *United States* v. *Louisiana,* 339 U. S. 699, 340

---

[1] The suit was originally instituted against Louisiana alone. Pursuant to the order of this Court the suit was thereafter broadened to include the other defendant States. 354 U. S. 515.

[2] See note 140, *infra*.

6

U. S. 899; *United States* v. *Texas,* 339 U. S. 707, 340 U. S. 900.[3]

On May 22, 1953, Congress, following earlier repeated unsuccessful attempts at legislation dealing with state and federal rights in submerged lands,[4] passed the Submerged Lands Act, 67 Stat. 29, 43 U. S. C. §§ 1301–1315. By that Act the United States relinquished to the coastal States all of its rights in such lands within certain geographical limits, and confirmed its own rights

---

[3] In 1945 the United States had proclaimed, as against other nations, its jurisdiction and control over such submerged lands to the edge of the Continental Shelf. Presidential Proclamation No. 2667, Sept. 28, 1945, 10 Fed. Reg. 12303, 59 Stat. 884. The accompanying Executive Order provided that "[n]either this Order nor the aforesaid proclamation shall be deemed to affect the determination by legislation or judicial decree of any issues between the United States and the several states, relating to the ownership or control of the subsoil and sea bed of the continental shelf within or outside of the three-mile limit." Exec. Order No. 9633, 10 Fed. Reg. 12305.

The "continental shelf," in the geological sense, is the gently sloping plain which underlies the seas adjacent to most land masses, extending seaward from shore to the point at which there is a marked increase in the gradient of the decline and where the continental slope leading to the true ocean bottom begins. In the Gulf of Mexico, the edge of the Continental Shelf, as so defined, lies as much as 200 miles from shore in some places. Christopher, The Outer Continental Shelf Lands Act: Key to a New Frontier, 6 Stan. L. Rev. 23, 24; H. R. Rep. No. 215, 83d Cong., 1st Sess. 6

[4] 1937–1938, 75th Congress:

S. 2164, S. J. Res. 208. Both would have confirmed the rights in the Federal Government. S. J. Res. 208 was passed by the Senate but not by the House.

1939, 76th Congress, 1st Session:

H. J. Res. 176, H. J. Res. 181, S. J. Res. 24, S. J. Res. 83, S. J. Res. 92. All would have confirmed the rights in the Federal Government.

1945–1946, 79th Congress:

H. J. Res. 118 and 17 similar bills, H. J. Res. 225, S. J. Res. 48. All would have quitclaimed rights to the States within their bound-

therein beyond those limits. The Act was sustained in *Alabama* v. *Texas*, 347 U. S. 272, as a constitutional exercise of Congress' power to dispose of federal property, Const. Art. IV, § 3, cl. 2. Since the Act concededly did not impair the validity of the *California, Louisiana,* and *Texas* cases, which are admittedly applicable to all coastal States, this case draws in question only the geographic extent to which the statute ceded to the States the federal rights established by those decisions.

---

aries. H. J. Res. 225 was passed by both Houses but vetoed by President Truman.

1948, 80th Congress, 2d Session:

H. R. 5992 and S. 1988 (quitclaim measures); S. 2222, H. R. 5890, and S. 2165 (to confirm States' rights in lands underlying inland waters and the Federal Government's rights in lands underlying the marginal sea). H. R. 5992 was passed by the House.

1949–1950, 81st Congress:

1st Sess: H. R. 5991, H. R. 5992 ("compromise" bills); S. 155, S. 1545 (quitclaim measures); S. 923, S. 2153, H. R. 354 (to confirm States' rights in lands beneath inland waters and Federal Government's rights in lands beneath marginal seas); S. 1700 (to establish a federal reserve). 2d Sess: H. R. 8137 (quitclaim measure); S. J. Res. 195 (interim management bill).

1951–1952, 82d Congress:

S. J. Res. 20, H. J. Res. 131, H. J. Res. 274 (interim management bills); H. R. 4484, S. 940 (quitclaim measures). H. R. 4484 was passed by the House in the 1st Session; S. J. Res. 20 was passed by the Senate after amending it by substituting therefor S. 940, in the 2d Session. S. J. Res. 20 as amended prevailed in conference, but was vetoed by President Truman.

1953, 83d Congress, 1st Session:

H. R. 2948 and 40 other bills, resulting in drafting of H. R. 4198 by Committee, S. J. Res. 13 (quitclaim measures); H. R. 5134, S. 1901 (to provide for administration of submerged lands seaward of those granted to States and to the edge of Continental Shelf). S. J. Res. 13 became the Submerged Lands Act, and S. 1901 became the Outer Continental Shelf Lands Act.

8

The purposes of the Submerged Lands Act are described in its title as follows:

"To confirm and establish the titles of the States to lands beneath navigable waters within State boundaries and to the natural resources within such lands and waters, to provide for the use and control of said lands and resources, and to confirm the jurisdiction and control of the United States over the natural resources of the seabed of the Continental Shelf seaward of State boundaries."

To effectuate these purposes the Act, in pertinent part—

1. relinquishes to the States the entire interest of the United States in all lands beneath navigable waters within state boundaries (§ 3, 43 U. S. C. § 1311); [5]

2. defines that area in terms of state boundaries "as they existed at the time [a] State became a member of the

---

[5] Section 3 provides:

"(a) It is hereby determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are hereby, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors in interest thereof;

"(b) (1) The United States hereby releases and relinquishes unto said States and persons aforesaid, except as otherwise reserved herein, all right, title, and interest of the United States, if any it has, in and to all said lands, improvements, and natural resources; (2) the United States hereby releases and relinquishes all claims of the United States, if any it has, for money or damages arising out of any operations of said States or persons pursuant to State authority upon or within said lands and navigable waters . . . ."

Union, or as heretofore approved by the Congress," not extending, however, seaward from the coast of any State more than three marine leagues [6] in the Gulf of Mexico or more than three geographical miles in the Atlantic and Pacific Oceans (§ 2, 43 U. S. C. § 1301) ; [7]

3. confirms to each State a seaward boundary of three geographical miles, without "questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has

---

[6] Nine marine, nautical, or geographic miles, or approximately 10½ land, statute or English miles.

[7] Section 2 provides:

"(a) The term 'lands beneath navigable waters' means—

.          .          .          .          .

"(2) all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary line of each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles . . .

.          .          .          .          .

"(b) The term 'boundaries' includes the seaward boundaries of a State or its boundaries in the Gulf of Mexico or any of the Great Lakes as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress, or as extended or confirmed pursuant to section 4 hereof but in no event shall the term 'boundaries' or the term 'lands beneath navigable waters' be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico;

"(c) The term 'coast line' means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters . . . ."

been heretofore approved by Congress" (§ 4, 43 U. S. C. § 1312) ; [8] and

4. for purposes of commerce, navigation, national defense, and international affairs, reserves to the United States all constitutional powers of regulation and control over the areas within which the proprietary interests of the States are recognized (§ 6 (a), 43 U. S. C. § 1314) ; [9] and retains in the United States all rights in submerged lands lying beyond those areas to the seaward limits of the Continental Shelf (§ 9, 43 U. S. C. § 1302). [10]

---

[8] Section 4 provides:

"The seaward boundary of each original coastal State is hereby approved and confirmed as a line three geographical miles distant from its coast line . . . . Any State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line . . . . Any claim heretofore or hereafter asserted either by constitutional provision, statute, or otherwise, indicating the intent of a State so to extend its boundaries is hereby approved and confirmed, without prejudice to its claim, if any it has, that its boundaries extend beyond that line. Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress."

[9] Section 6 (a) provides:

"The United States retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States and others by section 3 of this Act."

[10] Section 9 provides:

"Nothing in this Act shall be deemed to affect in any wise the rights of the United States to the natural resources of that portion

The United States concedes that the statute grants to each of the defendant States submerged land rights in the Gulf of Mexico to the extent of three geographical miles, but contends that none of them is entitled to anything more. The States, conceding that three leagues is the limit of the statute's grant in the Gulf, contend that each of them is entitled to that much. The wide-ranging arguments of the parties, reflecting no doubt the magnitude of the economic interests at stake,[11] can be reduced to the following basic contentions:

The Government starts with the premise that the Act grants submerged land rights to a distance of more than three miles only to the extent that a Gulf State can show, in accordance with § 2 (b) of the Act, either that it had a legally established seaward boundary in excess of three miles at the time of its admission to the Union, or that such a boundary was thereafter approved for it by Congress prior to the passage of the Submerged Lands Act. It is contended that the Act did not purport to determine, fix, or change the boundary of any State, but left it to the courts to ascertain whether a particular State had a seaward boundary meeting either of these requirements. The Government then urges, as to any State relying on its original seaward boundary, that the Act contemplates as the measure of the grant a boundary which existed subsequent to a State's admission to the

---

of the subsoil and seabed of the Continental Shelf lying seaward and outside of the area of lands beneath navigable waters, as defined in section 2 hereof, all of which natural resources appertain to the United States, and the jurisdiction and control of which by the United States is hereby confirmed."

Later in the same year, Congress passed the Outer Continental Shelf Lands Act, 67 Stat. 462, 43 U. S. C. §§ 1331–1343, which provides in detail for federal exploitation of the submerged lands of the Continental Shelf beyond those granted to the States by the Submerged Lands Act.

[11] See S. Rep. No. 133, 83d Cong., 1st Sess., pt. 2 (minority views), 6.

12

Union, and not one which existed only prior to admission—in other words, a boundary carrying the legal consequences of the event of admission. It reasons from this that since a State's seaward boundary cannot be greater than the national maritime boundary, and since the national boundary was at all relevant times never greater than three miles, no State could have had a seaward boundary in excess of three miles, regardless of what it may have claimed prior to admission. Further, the Government undertakes to show that, irrrespective of the extent of the national maritime boundary, none of these States ever had a valid seaward boundary in excess of three miles, even prior to admission, and that no such boundary was thereafter approved by Congress for any State.

The States, on the other hand, make several alternative arguments. At one extreme, they contend that the Submerged Lands Act *ipso facto* makes a three-league grant to all the Gulf States, or at least that the Act by its terms establishes the seaward boundary of some States, notably Texas and Florida, at three leagues. Alternatively, they argue that if the extent of such state boundaries "at the time" of admission was left to judicial determination, then the controlling inquiry is what seaward boundary each State had just prior to admission. If, however, the Act contemplates a boundary as fixed by the event of admission, each State contends that Congress fixed for it a three-league Gulf boundary, and that whatever may have been the extent of the national maritime boundary at the time is an irrelevant factor. Florida further contends that when it was readmitted to the Union in 1868, Congress approved for it a three-league Gulf boundary. And finally the States argue that if the national boundary is in any way relevant, it has at all material times in fact been at three leagues in the Gulf of Mexico.

Both sides have presented in support of their respective positions a massive array of historical documents, of which

we take judicial notice, and substantially agree that all the issues tendered can properly be disposed of on the basis of the pleadings and such documents.

In this opinion we consider the issues arising in common between the Government and all the defendant States, and the particular claims of Texas, Louisiana, Mississippi, and Alabama, all of which depend upon their original admission boundaries. The particular claims of Florida, which involve primarily its readmission boundary, are considered in a separate opinion. *Post,* p. 121.

I.

The Common Issues.

A. *The Statute On Its Face.*

The States' contention that the Act *ipso facto* grants them submerged land rights of three leagues in the Gulf may be shortly answered. The terms of the statute require rejection of such a construction. Rather the measure of the grant in excess of three miles is made to depend entirely upon the location of a State's original or later Congressionally approved maritime boundary, subject only to the three-league limitation of the grant.

We turn next to the question whether, as the States contend, the first of the two alternative requirements of § 2—a boundary which "existed at the time such State became a member of the Union"—is satisfied merely by showing a preadmission boundary, or whether, as the Government claims, that requirement contemplates only a boundary that carries the legal consequences of the event of admission. While it is manifest that the second requirement of § 2—a boundary which was "heretofore approved by Congress"—must take into account the effect of Congressional action, it is not clear from the face of the statute that the same is true of the first requirement—a

boundary "as it existed at the time [a] State became a member of the Union."

The Government argues that in construing the first requirement of § 2 the effect of Congressional action cannot be ignored because to do so would be to measure the boundary prior to the time a State became a member of the Union, and "at the time" cannot mean "prior to the time." However, it might be contended with equal force that to take account of the effect of Congressional action would be to measure the boundary after the time the State became a member of the Union, and "at the time" cannot mean "after the time." Indeed, if "at the time" were to be taken in a perfectly literal sense, it could refer only to the timeless instant before which the consequences of not being a State would obtain, and after which the consequences of statehood would follow, leaving unanswered the question whether the effect of Congressional action was to be considered or not. In short, if the term is to be given content it must be read as referring either to some time before or after the instant of admission, or to both times.

As an aid to construction of "at the time" in § 2, the Government points to § 4, the last sentence of which states:

"Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws *prior to or at the time* such State became a member of the Union, or if it has been heretofore approved by Congress." (Emphasis supplied.)

It is urged that the disjunctive use of the terms "prior to" and "at the time" shows that the latter must have been used to refer to the time after admission, since the phraseology would otherwise be redundant, and that such meaning should also be attributed to the same term in § 2,

thereby including the effect of Congressional action. But, as has already been indicated, "at the time" inherently can also be taken as referring to the preadmission period, thereby excluding the effect of such action. And on that basis there would be no redundancy in the phrase "prior to or at the time" if "at the time" meant immediately before the instant of admission and "prior to" referred to times substantially prior to admission; yet this would nonetheless exclude the effect of Congressional action. So far as the statute itself is concerned, the Government's argument is thus inconclusive.

Nor do the States' arguments upon the face of the statute illumine the meaning of "at the time" as used in § 2. They contend that the meaning of § 2 is explained or clarified by the last sentence of § 4. According to them, a boundary "existed at the time [a] State became a member of the Union" (§ 2) if "it was so provided by its constitution or laws prior to or at the time such State became a member of the Union . . . ." (§ 4.) Under this view, whatever the meaning of "at the time," the existence of a state constitutional or statutory three-league provision prior to admission would conclusively establish the boundary contemplated by the Act, irrespective of the character of Congressional action upon admission. However, this provision appears not in the definitional or granting sections of the statute (§§ 2 or 3), but in § 4, the purpose of which is to approve and confirm the boundaries of all States at three miles, and to negative any prejudice which might thereby result to claims in excess of three miles. It thus does not define the grant, but at most describes the claims protected from prejudice by § 4 in terms of their most likely nature. A fair reading of the section does not point to the conclusion that claims of this nature were deemed to be self-proving.

Finally, there is no indication on the face of the statute whether the Executive policy of the United States on the

extent of territorial waters is a relevant circumstance in ascertaining the location of state seaward boundaries for purposes of the Act.

Because the statute on its face is inconclusive as to these issues, we turn to the legislative history.

## B. *The Legislative History.*

This Court early held that the 13 original States, by virtue of the sovereignty acquired through revolution against the Crown, owned the lands beneath navigable inland waters within their territorial boundaries, and that each subsequently admitted State acquired similar rights as an inseparable attribute of the equal sovereignty guaranteed to it upon admission. *Pollard's Lessee* v. *Hagan,* 3 How. 212.[12] It was assumed by many, and not without reason,[13] that the same rule would be applied to lands beneath navigable waters of the marginal sea, that is, beyond low-water mark and the outer limit of inland waters. However, beginning in the 1930's, the Federal Government, while conceding the validity of the *Pollard* rule as to inland waters, disputed its applicability to submerged lands beyond that limit, and claimed ownership

---

[12] This holding was approved in a considerable number of subsequent cases. See, *e. g., Smith* v. *Maryland,* 18 How. 71, 74; *Mumford* v. *Wardwell,* 6 Wall. 423, 436; *Weber* v. *Harbor Commissioners,* 18 Wall. 57, 65–66; *McCready* v. *Virginia,* 94 U. S. 391, 394; *Shively* v. *Bowlby,* 152 U. S. 1, 26–28; *Manchester* v. *Massachusetts,* 139 U. S. 240, 259–260; *United States* v. *Mission Rock Co.,* 189 U. S. 391, 404; *Louisiana* v. *Mississippi,* 202 U. S. 1, 52; *The Abby Dodge,* 223 U. S. 166, 174; *Borax, Ltd.,* v. *Los Angeles,* 296 U. S. 10, 15–16. See also *Martin* v. *Waddell,* 16 Pet. 367, 410.

[13] This Court in the *California* case, *supra,* at 36, stated that in following the *Pollard* case, it had previously "used language strong enough to indicate that the Court then believed that states not only owned tidelands and soil under navigable inland waters, but also owned soils under all navigable waters within their territorial jurisdiction, whether inland or not."

of those lands for the United States.[14]   The controversy centered primarily on the ownership of the oil-rich submerged lands off the coast of California.   The State maintained that its original constitution, adopted in 1849 before it was admitted to the Union, established a seaward boundary three English miles from the coast,[15] that this boundary was ratified by the Act of Congress admitting it to the Union, and that therefore under the *Pollard* rule, it was entitled to all submerged lands lying within three English miles of its coast.   This Court refused so to apply *Pollard,* and held in the *California* case and the subsequent *Louisiana* and *Texas* cases, *supra,* that paramount rights in the marginal sea are an attribute of national rather than state sovereignty, irrespective of the location of state seaward boundaries.

Meanwhile an extended series of attempts was underway to secure Congressional legislation vesting in the States the ownership of those lands which would be theirs under an application of the *Pollard* rule to the marginal sea.[16]   It was strongly urged, both before and after the

---

[14] See S. Rep. No. 133, 83d Cong., 1st Sess. 21.

[15] One English, statute, or land mile equals approximately .87 marine, nautical, or geographical mile.   The conventional "3-mile limit" under international law refers to three marine miles, or approximately 3.45 land miles.

[16] See note 4, *ante.*   The legislative history of all the bills considered prior to enactment of the Submerged Lands Act in 1953 is directly relevant to the latter Act, since the purposes and phraseology of such bills, and the objections raised against them were substantially similar.   During the hearings on the final bills, all prior hearings on predecessor bills were expressly incorporated into the record, see Hearings before Subcommittee No. 1 of the House Committee on the Judiciary, 83d Cong., 1st Sess., on H. R. 2948 and similar bills 1–2 (hereinafter cited as 1953 House hearings) ; Hearings before the Senate Committee on Interior and Insular Affairs on S. J. Res. 13 and other bills 6–8 (hereinafter cited as 1953 Senate Hearings), and similar references to past hearings and debates were made on the floor of Congress, see 99 Cong. Rec. 2554, 2613, 4097.

*California* decision that because the States had for many years relied on the applicability of the *Pollard* rule to the marginal sea, it was just and equitable that they be definitively given the rights which follow from such an application of the rule, and the *California, Louisiana,* and *Texas* cases were severely criticized for not having so applied it.[17]

---

[17] H. R. Rep. No. 1778, 80th Cong., 2d Sess., to accompany H. R. 5992, at 1, 2, 3, 16 (Apr. 21, 1948): "H. R. 5992 is, in substance, the same as numerous bills introduced in the House. . . . [T]he aforementioned bills [were] introduced in the Congress to preserve the status quo as it was thought to be prior to the California decision . . . to confirm and establish the rights and claims of the 48 States, long asserted and enjoyed with the approval of the Federal Government, to the lands and resources beneath navigable waters within their boundaries . . . . The repeated assertions by our highest Court for a period of more than a century of the doctrine of State ownership of all navigable waters, whether inland or not, and the universal belief that such was the settled law, have for all practical purposes established a principle which the committee believes should as a matter of policy be recognized and confirmed by Congress as a rule of property law."

S. Rep. No. 1592, 80th Cong., 2d Sess., to accompany S. 1988, at 17–18 (June 10, 1948), after noting that the legal profession had long believed that the States owned the lands under navigable waters within their territorial jurisdiction, went on to comment:

"The evidence is conclusive that not only did our most eminent jurists so believe the law to be, but such was the belief of lower Federal court jurists and State supreme court jurists as reflected by more than 200 opinions. The pronouncements were accepted as the settled law by lawyers and authors of leading legal treatises.

"The present Court in the California decision did not expressly overrule these prior Supreme Court opinions but, in effect, said that all the eminent authorities were in error in their belief.

"For the first time in history the Court drew a distinction between the legal principles applicable to bays, harbors, sounds, and other inland waters on the one hand, and to submerged lands lying seaward of the low-water mark on the other, although it appears the Court had ample opportunity to do so in many previous cases, but failed or refused to draw such distinction. In the California decision the

Thus virtually every "quitclaim" measure introduced between 1945 and 1953, when the Submerged Lands Act was ultimately enacted, framed the grant in terms of "lands beneath navigable waters within State boundaries." This framework was employed because the sponsors understood this Court to have established, prior to the *California* decision, a rule of state ownership itself defined in

Court refused to apply what it termed 'the old inland water rule' to the submerged coastal lands; however, historically speaking, it seems clear that the rule of State ownership of inland waters is, in fact, an offshoot of the marginal sea rule established much earlier."

H. R. Rep. No. 695, 82d Cong., 1st Sess., to accompany H. R. 4484, ·at 5 (July 12, 1951):

"Title II merely fixes as the law of the land that which, throughout our history prior to the Supreme Court decision in the California case in 1947, was generally believed and accepted to be the law of the land; namely, that the respective States are the sovereign owners of the land beneath navigable waters within their boundaries and of the natural resources within such lands and waters. Therefore, title II recognizes, confirms, vests, and establishes in the States the title to the submerged lands, which they have long claimed, over which they have always exercised all the rights and attributes of ownership."

S. Rep. No. 133, 83d Cong., 1st Sess., to accompany S. J. Res. 13, at 7–8 (Mar. 27, 1953):

"All of these areas of submerged lands have been treated alike in this legislation because they have been possessed, used, and claimed by the States under the same rule of law, to wit: That the States own all lands beneath navigable waters within their respective boundaries. Prior to the California decision, no distinction had been made between lands beneath inland waters and lands beneath seaward waters so long as they were within State boundaries.

"The rule was stated by the Supreme Court in the early case of *Pollard* v. *Hagan* . . . .

. . . . .

"The purpose of this legislation is to write the law for the future as the Supreme Court believed it to be in the past—that the States shall own and have proprietary use of all lands under navigable waters within their territorial jurisdiction, whether inland or seaward, subject only to the governmental powers delegated to the United States by the Constitution."

terms of state territorial boundaries, whether located at or below low-water mark.[18]   Since, however, none of the cases which had applied that rule involved lands below low-water mark, and since the *California* and subsequent *Louisiana* and *Texas* cases adopted for such lands a rule which does not depend upon state boundaries, this Court has never had occasion to consider the precise nature and method of determining state territorial boundaries in the open sea, such as would circumscribe the extent of state ownership of offshore lands under an application of the *Pollard* rule.   Because Congress, in the exercise of its constitutional power to dispose of federal property, has chosen so to frame its grant, we are now called on to resolve such questions in light of the Act's history and purposes.

1. *Confirmation of All Boundaries at Three Miles.*

From the very outset, the sponsors of "quitclaim" legislation believed that all States were entitled to at least three miles of coastal submerged lands.[19]   The earliest bills confirmed to the States all lands beneath navigable waters within their boundaries, and defined "lands beneath navigable waters" to include at least all lands lying within three geographical miles of the coast of each State.[20]   However, they contained no definition of

---

[18] For example, the very first "quitclaim" bill introduced in Congress—H. J. Res. 118, 79th Cong., 1st Sess., provided:

"*Resolved* . . . That, in consideration of the premises, the United States of America hereby releases, remises, and quitclaims all right, title, interest, claim, or demand of the United States of America in and to all lands beneath tidewaters and all lands beneath navigable waters within the boundaries of each of the respective States . . . ."

[19] See, *e. g.*, 91 Cong. Rec. 8867 (remarks of Representative Gearhart) ; 92 Cong. Rec. 10310 (remarks of Representative Sumners). See also 92 Cong. Rec. 9519 (remarks of Senator Overton).

[20] H. J. Res. 118, 79th Cong., 1st Sess.; H. J. Res. 225, 79th Cong., 1st Sess.; H. R. 5992, 80th Cong., 2d Sess.; S. 1988, 80th Cong., 2d

"boundaries," and it was apparently assumed that the boundaries of all States extended at least three miles.[21] Opponents of such legislation quickly pointed out that while California based its three-mile claim on an expressly defined maritime boundary, many, if not most, of the coastal States lacked such a boundary,[22] and that therefore, such States could not avail themselves of the *Pollard* rule, the applicability of which is restricted to areas within the actual territorial boundaries of the State, even assuming the rule to be capable of application beyond low-water mark.[23] Proponents of the legislation alleged it to be

Sess. H. J. Res. 118 and H. J. Res. 225 used the term "lands beneath tidewaters" to denote the lands beneath the navigable waters of the marginal sea.

[21] See H. R. Rep. No. 927, 79th Cong., 1st Sess., to accompany H. J. Res. 225, at 2 (July 17, 1945): "The ownership by the States of these lands as above stated is coextensive with the States' boundaries, which in the case of the coastal States is in no instance less than 3 miles from the coast line." 92 Cong. Rec. 9541 (remarks of Senator Cordon): "[T]he joint resolution is limited to those submerged lands within the boundaries of the several States, with this exception, that if there should be—and there conceivably cannot be a State whose boundary did not go 3 miles at sea—then it would cover 3 miles at sea."

[22] California Constitution of 1849, Art. XII, § 1. California claimed that this boundary was ratified by the Act admitting it to the Union. 9 Stat. 452. See 92 Cong. Rec. 9614 (remarks of Senator Knowland). Attorney General Clark testified that six of the 11 original coastal States had not yet expressly claimed a three-mile boundary in the marginal sea, and that the other five had done so unilaterally long subsequent to the formation of the Union—Massachusetts in 1859 (see Stat. 1859, c. 289, as amended, Mass. Gen. Laws Ann., c. 1, § 3), Rhode Island in 1872 (R. I. Gen. Stat. 1872, c. 1, § 1), New Jersey in 1906 (see N. J. Stat. Ann., Tit. 40, § 18–5), New Hampshire in 1901 (N. H. Laws 1901, c. 115), and Georgia in 1916 (see Acts 1916, p. 29, Ga. Code Ann. § 15–101).

[23] See 92 Cong. Rec. 9524–9526 (remarks of Senator Donnell); Joint Hearings before the Committees on the Judiciary of the Congress on S. 1988 and similar House bills, 80th Cong., 2d Sess. 885–895 (hereinafter cited as 1948 Joint Hearings).

defective in that it granted only those lands beneath navigable waters which lay within state boundaries, and that this Court in the *California* case, while not expressly passing on the question, had cast doubt on whether any of the original States ever had a boundary beyond its coast.[24]   As a result, a new section was added, substantially similar to the second and third sentences of § 4 of the present Act (see note 8, *ante*), which permitted each State which had not already done so to extend its boundary seaward three miles and approved all such extensions theretofore or thereafter made, without prejudice to any State's claim that its boundary extended beyond three miles.[25]

It is not entirely clear on what theory Congress thus concluded that each State owned the submerged lands within three miles of its coast, irrespective of the existence of an expressly defined seaward boundary to that distance. It was substantially agreed that the 13 original Colonies owned the lands within three miles of their coasts because of their sovereignty and the alleged international custom which permitted a nation to extend its territorial jurisdiction that far.[26]   Some proponents of the legislation seem to have concluded that therefore, not only did the

---

[24] *Id.*, 93–95, 884–886.

[25] Because of fears that this permission to extend boundaries would not protect grantees of the original States who had received their grants at a time when the State had not yet expressly extended its boundaries, a provision was subsequently inserted as the first sentence of § 4 of the present Act, absolutely confirming the boundary of each original State at three miles.   See 1953 Senate Hearings, pt. II (Exec. Sess.), 1316; 99 Cong. Rec. 2697.   The last sentence of § 4 was first inserted without explanation in H. R. 8137, 81st Cong., 2d Sess., and was carried forward as part of S. J. Res. 20, 82d Cong., 2d Sess., as it was amended and passed by Congress and vetoed by President Truman.   See 98 Cong. Rec. 2886.

[26] See 91 Cong. Rec. 8858; 92 Cong. Rec. 10310.   See also *Manchester* v. *Massachusetts*, 139 U. S. 240, 257, 258.

original States retain such rights after formation of the Union, but that subsequently admitted States acquired similar rights within three miles, irrespective of the location of their boundaries, by the operation of the equal-footing clause.[27]   It was also suggested that state ownership within three miles came about by operation of federal law because of the Federal Government's assumed adherence to the three-mile limit of territorial waters.[28] While some speakers maintained that these factors in effect gave each State a three-mile maritime boundary,[29] others eschewed technical reliance on the matter of boundaries and thought it sufficient that the *Pollard* rule had always been thought to confer ownership on the State of lands within three miles of the coast and that the States ought to be restored to the position they believed they had formerly occupied.[30]   And there is some sugges-

---

[27] See, *e. g.*, 98 Cong. Rec. 2884–2885 (remarks of Senator Holland). See also H. R. Rep. No. 927, 79th Cong., 1st Sess. 2.

[28] See 98 Cong. Rec. 3351 (remarks of Senator Holland); 1953 House Hearings 222 (remarks of Attorney General Brownell); 99 Cong. Rec. 2757, 2922–2923, 4095 (remarks of Senator Holland). Solicitor General Perlman, while rejecting the idea that the existence of a seaward boundary entitled the State to ownership of the underlying lands, stated that California was entitled to a boundary for other purposes of three nautical miles, as opposed to the three English miles asserted by its constitution, because of the federal three-mile policy. Hearings before the Senate Committee on Interior and Insular Affairs, on S. J. Res. 20 and S. 940, 82d Cong., 1st Sess. 40 (hereinafter cited as 1951 Senate Hearings).

[29] See 92 Cong. Rec. 9541 (remarks of Senator Cordon); *id.*, 9619 (remarks of Senator Capehart); 99 Cong. Rec. 3265 (remarks of Senator Hill).

[30] Leander I. Shelley, counsel for the port authorities, whose proposal that all States be permitted to extend their boundaries to three miles was adopted by the Committee, said: "My position is that prior to the decision of the Supreme Court in the California case, practically everybody concerned . . . was under the impression that all the coastal States owned the land for 3 miles out. . . .

"Whether their failure to be in that position is because of a title

tion that since many States, under the Congressional view of *Pollard,* had indisputable claims to three miles of submerged lands, the remainder ought to be treated on a parity whether or not their claims were technically justified.[31]   The upshot of all of these differing views was the confirmation of each coastal State's seaward boundary at three geographical miles.

## 2. *Boundaries Beyond Three Miles.*

Whatever may have been the uncertainty attending the relevance of state boundaries with respect to rights in submerged lands within three miles of the coast, we find a clear understanding by Congress that the question of rights beyond three miles turned on the existence of an expressly defined state boundary beyond three miles. Congress was aware that several States claimed such a boundary. Texas throughout repeatedly asserted its claim that when an independent republic its statutes established a three-league maritime boundary, and that the United States ratified that boundary when Texas was admitted to the Union and permitted Texas to retain its own public lands.[32]   Florida repeatedly asserted its claim that subsequent to its secession at the time of the Civil War, it framed a constitution which established a three-league boundary along its Gulf coast, and that such boundary was ratified when Congress in 1868 approved

question or boundary question is immaterial to us.  Our position is that they should be restored to where they thought they were."  1948 Joint Hearings 894.  See also 92 Cong. Rec. 9515–9516 (remarks of Senator O'Mahoney); *id.,* 9519 (remarks of Senator Overton); 99 Cong. Rec. 4095 (remarks of Senator Holland).

[31] See 98 Cong. Rec. 3351–3352 (remarks of Senator Holland).

[32] *E. g.,* 91 Cong. Rec. 8867; 92 Cong. Rec. 9518; Hearings before the Senate Committee on Interior and Insular Affairs on S. 155, S. 923, S. 1545, S. 1700, and S. 2153, 81st Cong., 1st Sess. 131 (hereinafter cited as 1949 Senate Hearings); 1953 Senate Hearings 212–234; 99 Cong. Rec. 2620, 2830, 4171–4175.

the State's constitution and readmitted it to the Union.[33] Louisiana asserted that the Act of Congress admitting it to the Union in 1812 fixed for it a three-league maritime boundary by virtue of the provision which includes within the State "all islands within three leagues of the coast." [34] And it was suggested that Mississippi and Alabama might claim boundaries six leagues in the Gulf because of similar provisions in the Acts admitting them to the Union.[35]

It was recognized that if the legal existence of such boundaries could be established, they would clearly entitle the respective States to submerged land rights to that distance under an application of the *Pollard* rule to the marginal sea. Hence, while a three-mile boundary was expressly confirmed for all coastal States, the right of the Gulf States to prove boundaries in excess of three miles was preserved. This treatment of the matter was carried into all the numerous "quitclaim" bills by language similar to that found in § 4 of the present Act, confirming all coastal state boundaries at three miles and negating any prejudice to boundary claims in excess of that.[36] Repeated expressions of the Act's sponsors make it absolutely clear that no boundary in excess of three miles was fixed for any State, but that a State would have to establish the existence of such a boundary in judicial proceedings.[37]

---

[33] *E. g.*, 92 Cong. Rec. 9516; 99 Cong. Rec. 2621, 2752, 4095–4096.

[34] See 1949 Senate Hearings 187; 98 Cong. Rec. 3352; 1953 Senate Hearings 47–48, 536, 1093, 1115; 99 Cong. Rec. 2896.

[35] Hearings before the Senate Judiciary Committee on S. J. Res. 48 and H. J. Res. 225, 79th Cong., 2d Sess. 228–230 (hereinafter cited as 1946 Senate Hearings); 1951 Senate Hearings 420.

[36] The structure of § 4 was so explained by Senators Cordon, Holland, and Long. 1953 Senate Hearings, pt. II (Exec. Sess.), 1317–1318; 99 Cong. Rec. 2621, 2698, 4095–4096.

[37] 92 Cong. Rec. 9441–9442, 9516; 1953 Senate Hearings 48–49; *id.*, pt. II (Exec. Sess.), 1318, 1414–1415; 99 Cong. Rec. 2558–2559, 2620–2622, 2632–2633, 2694–2695, 2703, 2746, 2754–2755, 2757, 2896–2897, 2933, 4095–4096, 4116.

26

The many individual expressions of views as to the location of particular state boundaries—notably statements that the effect of the Act would be to give Texas and Florida three leagues of submerged land rights [38]—while undoubtedly representing the sincere beliefs of the speakers, cannot serve to relieve this Court from making an independent judicial inquiry and adjudication on the subject, as contemplated by Congress.

The earlier "quitclaim" bills defined the grant in terms of presently existing boundaries,[39] since such boundaries would have circumscribed the lands owned by the States under an application of *Pollard* to the marginal sea. However, the sponsors of these measures soon recognized that present boundaries could be ascertained only by reference to historic events. The claims advanced by the Gulf States during consideration of earlier bills were identical to those subsequently asserted.[40] The theory of those claims, as we have noted, depended either, as in the cases of Texas and Florida, upon a constitutional or statutory provision allegedly ratified by Congressional acquiescence, or, as in the cases of Louisiana, Mississippi, and Alabama, upon express Congressional action. Indeed, it could hardly have been contended that Congressional action surrounding the event of admission was not relevant to the

---

[38] 98 Cong. Rec. 3347, 3350 (Senators Connally and Holland); 1953 House Hearings 181, 195 (Secretary of the Interior McKay); 1953 Senate Hearings 957 (Attorney General Brownell); letter from President Eisenhower to Jack Porter, Republican National Committeeman, Dec. 4, 1957, reported in Houston Post, Dec. 7, 1957, § 1, pp. 1–2; letter from President Eisenhower to Senator Anderson, Apr. 24, 1953, reprinted in 99 Cong. Rec. 3865; letter from President Eisenhower to Price Daniel, Governor of Texas, Nov. 7, 1957, printed at p. 294 of Texas' brief.

[39] H. J. Res. 118, 79th Cong., 1st Sess.; H. J. Res. 225, S. J. Res. 48, 79th Cong., 2d Sess.; S. 1988 and H. R. 5992, 80th Cong., 2d Sess.

[40] See, *e. g.*, 1946 Senate Hearings 183; 91 Cong. Rec. 8867; 92 Cong. Rec. 9515–9518.

determination of present boundaries. Some suggestions were made, however, that States might by their own action have effectively extended, or be able to extend, their boundaries subsequent to admission.[41] To exclude the possibility that States might be able to establish present boundaries based on extravagant unilateral extensions, such as those recently made by Texas and Louisiana,[42] subsequent drafts of the bill introduced the twofold test of the present Act—boundaries which existed at the time of admission and boundaries heretofore approved by Congress.[43] It is apparent that the purpose of the change was not to alter the basic theory of the grant, but to assure that the determination of boundaries would be made in

---

[41] *E. g.*, 92 Cong. Rec. 9518, 9628 (remarks of Senator Connally); *id.*, 9524 (remarks of Senator Donnell).

[42] La. Act No. 55 of 1938, La. Rev. Stat. 49:1 (27 miles); Act of May 16, 1941, L. Tex., 47th Leg., p. 454 (27 miles), Act of May 23, 1947, L. Tex., 50th Leg., p. 451 (outer edge of Continental Shelf), Vernon's Tex. Civ. Stat., Art. 5415a. See also Act of May 25, 1947, L. Tex., 50th Leg., p. 490, Vernon's Tex. Civ. Stat., Art. 1592a (boundaries of counties extended to edge of Continental Shelf).

[43] An amendment was first proposed for that purpose by Senator Capehart on the floor during consideration of H. J. Res. 225, 79th Cong., 2d Sess., 92 Cong. Rec. 9541, 9619. It did not contain the "heretofore approved by Congress" provision (see note 7, *ante*), and was defeated, apparently on the ground that the boundaries of some States might have been lawfully altered since their admission. See 92 Cong. Rec. 9630 (remarks of Senator McCarran); *id.*, 9632 (amendment defeated). During the Eightieth Congress, Second Session, H. R. 5992 and S. 1988 were originally introduced with present boundaries still the measure of the grant. During the hearings on the bills, the matter of unilateral extensions was called to the Committee's attention several times. 1948 Joint Hearings 653–654 (Attorney General Clark), *id.*, 734 (Secretary of the Interior Krug), and an amendment specifically incorporating the twofold test of the present Act was proposed to the Committee by Leander I. Shelley, counsel for the port authorities, *id.*, 886. Both H. R. 5992 and S. 1988, when reported out of Committee, incorporated the proposed change. See 94 Cong. Rec. 5154, S. Rep. No. 1592, 80th Cong., 2d Sess. 2.

accordance with that theory—that the States should be "restored" to the ownership of submerged lands within their present boundaries, determined, however, by the historic action taken with respect to them jointly by Congress and the State.[44] It was such action that the framers of this legislation conceived to fix the States' boundaries

[44] Representative Willis of Louisiana made clear the nature of the inquiry it was contemplated the courts would make to ascertain the location of "historic boundaries":

"Mr. WILLIS. Do you know of a better criteria than a historic approach?

"Secretary McKAY. No, sir.

"Mr. WILLIS. Let us apply that criteria to Texas, for instance, and I think you and I are in thorough agreement. Texas was a republic. The Republic of Texas took certain action. Then there was a treaty between the Republic of Texas and the United States preliminary to admission. There might have been maps exhibited or maps in existence at that time. Then Congress passed an act admitting Texas into the Union, and then Texas adopted a constitution delimiting its historic boundaries. Those are the historic documents that set forth Texas' title; is that correct?

"Secretary McKAY. That is right. If my memory is correct, the United States would not take the land. They gave it back to Texas.

"Mr. WILLIS. That is right. There is nothing unusual about that. Let me illustrate the point in this way. I know you are not a lawyer, but I think you can follow this. If a farmer should consult a lawyer to find out what the limits of his farm are, that lawyer would have to examine the papers. He would have to go first to the patent. He would have to consult all the deeds in the chain of title. There might be maps attached to those deeds which help to interpret them. After his study he would give an opinion on the limits, based upon the history of that title, and every link in the chain.

".  .  . There has been some talk here this morning about 3 miles. The principle, though, that I think you and I agree on is that we have to go to the documents to find out what our historic boundaries are?

"Secretary McKAY. Yes, sir." 1953 House Hearings 197–198. And on the floor of the House, he explained "historic boundaries" as follows:

"You will hear a great deal during general debate today, first about

against subsequent change without their consent and therefore to confer upon them the long-standing equities which the measure was intended to recognize.[45]

Somewhat later, the last sentence of the present Act's § 4 was added, for the specific purpose of assuring that the boundary claims of Texas and Florida would be preserved.[46] The first part of the sentence (see note 8, *ante*), intended to refer to Texas alone, protects the State's claim to a three-league boundary as "provided by its constitution or laws prior to or at the time such State became a member of the Union." That claim, however, was asserted to rest not only on its statute but also on the

the historic boundaries and second about the outer continental shelf of the States. Let me explain what these terms mean.

"Each State was admitted into the Union by an act of Congress, and each State adopted a constitution which was approved by the Congress. The act of Congress and the first Constitution defined the boundaries of each State in the first instance. In some cases treaties were involved. Thus the Louisiana Territory was retroceded or reconveyed by Spain to France in 1803, and then France, in turn, transferred the Louisiana Territory to the United States. Thereafter, Louisiana was admitted into the Union as a State under an act of Congress of 1812, and the first Constitution of Louisiana, of 1812, was approved by the Congress. Both Spain and France exerted influence over and claimed, owned, and controlled a marginal belt as part of the Louisiana Territory, as shown by maps then used and still in existence.

"Obviously, we must resort to all of such ancient documents in order to determine the true and actual historic boundaries of each State, and as a practical matter, that is exactly what this bill permits and accomplishes. I do not know of any better criteria for the establishment of the boundaries of the States than a historic approach." 99 Cong. Rec. 2504.

[45] See 99 Cong. Rec. 4174–4175 (remarks of Senator Daniel); *New Mexico* v. *Texas*, 275 U. S. 279, 276 U. S. 557, 558; *New Mexico* v. *Colorado*, 267 U. S. 30.

[46] 1953 Senate Hearings, pt. II (Exec. Sess.), 1317–1319; 99 Cong. Rec. 3551–3552, 4095.

action of Congress in admitting it to the Union.[47]   If any doubt could remain that the event of admission is a vital circumstance in ascertaining the location of boundaries which existed "at the time" of admission within the meaning of the Submerged Lands Act, it is conclusively dispelled by repeated statements of its proponents to that effect.[48]

We conclude, therefore, that the States' contention that preadmission boundaries, standing alone, suffice to meet the requirements of the statute is not tenable.

3. *The Question of Executive Policy Respecting the "Three-Mile Limit."*

During consideration of the various "quitclaim" bills between 1945 and 1953, the suggestion that international questions might be raised by the bill constantly recurred. It was asserted that the United States might be embarrassed in its dealings with other nations, first, by permitting States to exercise rights in submerged lands beyond three miles,[49] and, second, by recognizing that the boundaries of some States might extend beyond three miles from the coast.[50]   The first objection was laid to rest by the

---

[47] It is worth observing that at one time the claims protected from prejudice by § 4 included not only those based on state constitutional or statutory provisions, but also those based on "any treaty ratified by the Senate of the United States" or on "an act of Congress."   99 Cong. Rec. 2567.   This provision was inserted specifically to preserve Texas' claim based on the Joint Resolution of Annexation (see p. 37, *post*), which was loosely referred to as a "treaty" between Texas and the United States.   *Id.*, 2568.   See also 1953 House Hearings 301–302.

[48] 1949 Senate Hearings 138–139; 1953 Senate Hearings 957, 1076–1078; 99 Cong. Rec. 2504, 2558–2559, 2746, 2754, 2755, 2933, 4095, 4096, 4116, 4171, 4175, 4477.

[49] *E. g.*, 99 Cong. Rec. 2916 (remarks of Senator Douglas).

[50] 1948 Joint Hearings 618 (Attorney General Clark); Hearings before Subcommittee No. 1 of the House Judiciary Committee on H. R. 5991 and H. R. 5992, 81st Cong., 1st Sess. 196 (Solicitor General Perlman); 1951 Senate Hearings 40, 393 (Solicitor General

testimony of Jack B. Tate, Deputy Legal Adviser to the State Department. Mr. Tate stated that exploitation of submerged lands involved a jurisdiction of a very special and limited character, and he assured the Committee that assertion of such a jurisdiction beyond three miles would not conflict with international law or the traditional United States position on the extent of territorial waters. He concluded that since the United States had already asserted exclusive rights in the Continental Shelf as against the world, the question to what extent those rights were to be exercised by the Federal Government and to what extent by the States was one of wholly domestic concern within the power of Congress to resolve.[51]

The second objection, however—that to recognize by the Act the possible existence of some state maritime boundaries beyond three miles would embarrass this country in its dealings with other nations—was persistently pressed by the State Department and by opponents of the bill. The bill's supporters consistently took the position that under the *Pollard* rule as they understood it, the extent of a State's submerged land rights in excess of three miles depended entirely upon the location of its maritime boundary as fixed by historical events,[52] and that to the extent a State's boundary had been so fixed beyond three miles, it constituted an exception to this country's assumed adherence to the three-mile limit. The admission of Texas and the readmission of Florida

---

Perlman); 97 Cong. Rec. 9167 (letter from Solicitor General Perlman introduced by Representative Celler); 98 Cong. Rec. 5247 (Representatives Mansfield and Feighan); 1953 Senate Hearings 27 (Assistant Secretary of State Morton); *id.*, 663 (Senator Anderson); *id.*, 678–679, 680–684 (former Solicitor General Perlman); *id.*, 1053–1086 (State Department Deputy Legal Adviser Tate); 99 Cong. Rec. 2502–2503 (Representative Hays); *id.*, 2568 (Representative Yates); *id.*, 3034 (Senator Anderson).

[51] 1953 Senate Hearings 1051–1086.

[52] 1953 Senate Hearings 326; *id.*, pt. II (Exec. Sess.), 1415.

were repeatedly asserted as instances where Congress had made exceptions to the three-mile policy, purportedly based on the shallowness of waters in the Gulf and the alleged Spanish custom of claiming three leagues of territorial waters.[53]

The State Department, confronted with this argument, tenaciously maintained that it had never recognized any boundaries in excess of three miles.[54]  It insisted that by virtue of federal supremacy in the field of foreign relations, the territorial claims of the States could not exceed those of the Nation, and that, therefore, if the bill recognized the effectiveness of the relied-on historical events to fix boundaries beyond three miles despite the State Department's refusal so to recognize them, the bill would violate this country's consistent foreign policy.  The Government now urges in this case a closely similar contention.  It says that the Submerged Lands Act did not establish any formula for the ascertainment of state boundaries but left them to be judicially determined, and that because of federal supremacy in the field of foreign relations, this Court must hold that the Executive policy of claiming no more than three miles of territorial waters—allegedly in force at all relevant times, and evidenced by the State Department's consistent refusal to recognize boundaries in excess of three miles—worked a

---

[53] Hearings before the House Judiciary Committee and a Special Subcommittee of the Senate Judiciary Committee on H. J. Res. 118 and other bills, 79th Cong., 1st Sess. 23; 91 Cong. Rec. 8867; 1949 Senate Hearings 137–138; 1953 Senate Hearings 670, 1076–1078, 1082–1084; 99 Cong. Rec. 4074–4075, 4172–4173.  Even Senator Anderson, who was opposed to the bill, in proposing that the grant should in any event be limited to three leagues in the Gulf of Mexico, conceived that distance to be justified as an exception to this country's three-mile policy, based on the fact that the Gulf is very largely enclosed by land. 1953 Senate Hearings, pt. II (Exec. Sess.), 1349.

[54] 1953 Senate Hearings 319–323, 1056–1057, 1060–1063, 1076–1078, 1080–1082.  See also 99 Cong. Rec. 2513, 2569, 3041–3042.

decisive limitation upon the extent of all state maritime boundaries for purposes of this Act.[55]

We agree that the Submerged Lands Act does not contain any formula to be followed in the judicial ascertainment of state boundaries, and that therefore, we must determine, as an independent matter, whether boundaries, for purposes of the Act, are to be taken as fixed by historical events such as those pointed to in the Congressional hearings and debates, or whether they must be regarded as limited by Executive policy on the extent of territorial waters, as contended by the Government. However, in light of the purely domestic purposes of the Act, we see no irreconcilable conflict between the Executive policy relied on by the Government and the historical events claimed to have fixed seaward boundaries for some States in excess of three miles. We think that the Government's contentions on this score rest on an oversimplification of the problem.

A land boundary between two States is an easily understood concept. It marks the place where the full sovereignty of one State ends and that of the other begins. The concept of a boundary in the sea, however, is a more elusive one. The high seas, as distinguished from inland waters, are generally conceded by modern nations to be

---

[55] Similar suggestions seem to have been made in the course of consideration of the various "quitclaim" bills, though never fully developed. See 92 Cong. Rec. 9518 (remarks of Senator Connally); 1953 Senate Hearings 316–317 (statement of John J. Real); 99 Cong. Rec. 3037 (remarks of Senators Gore and Anderson); id., 3265 (remarks of Senators Morse and Hill); id., 3270 (remarks of Senator Hill). See also 1953 Senate Hearings 1078 (remarks of Senator Daniel). In this Court the Government has undertaken to support its position respecting this Nation's adherence to the three-mile limit by a letter from the Secretary of State summarizing historical Executive policy in that regard. In our view of the issues in this case we do not reach the Government's contention that the Secretary's letter would be conclusive upon us as to the existence of that policy.

subject to the exclusive sovereignty of no single nation.[56]
It is recognized, however, that a nation may extend its
national authority into the adjacent sea to a limited
distance for various purposes. For hundreds of years,
nations have asserted the right to fish, to control smug-
gling, and to enforce sanitary measures within varying
distances from their seacoasts.[57] Early in this country's
history, the modern notion had begun to develop that a
country is entitled to full territorial jurisdiction over a belt
of waters adjoining its coast.[58] However, even this juris-
diction is limited by the right of foreign vessels to innocent
passage.[59] The extent to which a nation can extend its
power into the sea for any purpose is subject to the
consent of other nations, and assertions of jurisdiction to
different distances may be recognized for different pur-
poses.[60] In a manner of speaking, a nation which pur-
ports to exercise any rights to a given distance in the sea
may be said to have a maritime boundary at that distance.
But such a boundary, even if it delimits territorial waters,
confers rights more limited than a land boundary. It is
only in a very special sense, therefore, that the foreign
policy of this country respecting the limit of terri-
torial waters results in the establishment of a "national
boundary."

---

[56] See Mouton, The Continental Shelf 183–192 (1952 ed.).

[57] See 1951 Senate Hearings 511.

[58] See United States v. California, supra, at 33.

[59] See 1953 Senate Hearings 1074–1075.

[60] For example, the United States has long claimed the right to
exercise jurisdiction over domestic and foreign vessels beyond the
three-mile limit for purposes of customs control, 1 Stat. 145, 164, 648,
668; Anti-Smuggling Act of Aug. 5, 1935, 49 Stat. 517, 19 U. S. C.
§§ 1701–1711, and for defense purposes, 62 Stat. 799, 18 U. S. C.
§ 2152, and this practice is recognized by international law. See 1953
Senate Hearings 1087–1088; American Law Institute, Restatement
of the Foreign Relations Law of the United States (Tentative Draft
No. 2, May 8, 1958), §§ 8 (c), 21.

The power to admit new States resides in Congress. The President, on the other hand, is the constitutional representative of the United States in its dealings with foreign nations. From the former springs the power to establish state boundaries; from the latter comes the power to determine how far this country will claim territorial rights in the marginal sea as against other nations. Any such determination is, of course, binding on the States. The exercise of Congress' power to admit new States, while it may have international consequences, also entails consequences as between Nation and State. We need not decide whether action by Congress fixing a State's territorial boundary more than three miles beyond its coast constitutes an overriding determination that the State, and therefore this country, are to claim that much territory against foreign nations. It is sufficient for present purposes to note that there is no question of Congress' power to fix state land and water boundaries as a domestic matter. Such a boundary, fully effective as between Nation and State, undoubtedly circumscribes the extent of navigable *inland* waters and underlying lands owned by the State under the *Pollard* rule. Were that rule applicable also to the marginal sea—the premise on which Congress proceeded in enacting the Submerged Lands Act—it is clear that such a boundary would be similarly effective to circumscribe the extent of submerged lands *beyond* low-water mark, and within the limits of the Continental Shelf, owned by the State. For, as the Government readily concedes, the right to exercise jurisdiction and control over the seabed and subsoil of the Continental Shelf is not internationally restricted by the limit of territorial waters.

We conclude that, consonant with the purpose of Congress to grant to the States, subject to the three-league limitation, the lands they would have owned had the *Pollard* rule been held applicable to the marginal sea, a

state territorial boundary beyond three miles is established for purposes of the Submerged Lands Act by Congressional action so fixing it, irrespective of the limit of territorial waters. We turn now to the task of ascertaining what boundary was so fixed for each of the defendant States.

## II.

### THE PARTICULAR CLAIMS OF TEXAS.

Texas, the only one of the defendant States which had the status of an independent nation immediately prior to its admission, contends that it had a three-league maritime boundary which "existed at the time [it] became a member of the Union" in 1845. Whether that is so for the purposes of the Submerged Lands Act depends upon a proper construction of the Congressional action admitting the State to the Union.

Texas declared its independence from Mexico on March 2, 1836, 1 Laws, Republic of Texas, 3–7, and on December 19, 1836, the Texan Congress passed an Act to define its boundaries, which were described in part as

> "beginning at the mouth of the Sabine river, and running west along the Gulf of Mexico *three leagues from land,* to the mouth of the Rio Grande, thence up the principal stream of said river . . . ." *Id.,* 133. (Emphasis added.) See diagram at p. 65, *post.*[61]

---

[61] The boundaries of Texas were described in full by the Act as follows:

"That from and after the passage of this act, the civil and political jurisdiction of this republic be, and is hereby declared to extend to the following boundaries, to wit: beginning at the mouth of the Sabine river, and running west along the Gulf of Mexico three leagues from land, to the mouth of the Rio Grande, thence up the principal stream of said river to its source, thence due north to the forty-second degree of north latitude, thence along the boundary line as defined in

In March 1837 this country recognized the Republic of Texas.[62] On April 25, 1838, the United States entered into a convention with the Republic to establish a boundary between the two countries and to provide for a survey of part of it.[63] On April 12, 1844, President Tyler concluded a Treaty of Annexation with the Republic, but on June 8, 1844, the Senate refused to ratify it.[64] On March 1, 1845, President Tyler signed a Joint Resolution of Congress for the annexation of Texas, which provided:

> "That Congress doth consent that the territory *properly included within, and rightfully belonging to* the Republic of Texas, may be erected into a new State, to be called the State of Texas . . . . Said State to be formed, *subject to the adjustment by this government of all questions of boundary that may arise with other governments . . . .*"[65] (Emphasis added.)

Pursuant to this Resolution, the people of Texas adopted a constitution, which was submitted to Congress, and by Joint Resolution of December 29, 1845, Texas was admitted to the Union in accordance with the terms of the previous Joint Resolution.[66] The 1836 Texas Boundary Act remained in force up to the time of admission,

---

the treaty between the United States and Spain, to the beginning: and that the president be, and is hereby authorized and required to open a negotiation with the government of the United States of America, so soon as in his opinion the public interest requires it, to ascertain and define the boundary line as agreed upon in said treaty."

[62] On March 1, the Senate resolved that recognition of Texas would be expedient and proper, Cong. Globe, 24th Cong., 2d Sess. 83, 270. A Chargé d'Affaires to be sent there was appointed by the President on March 3, 4 S. Exec. J. 631, and confirmed by the Senate on March 7, 5 *id.*, 17.

[63] 8 Stat. 511.

[64] S. Doc. No. 341, 28th Cong., 1st Sess. 10; Cong. Globe, 28th Cong., 1st Sess. 652.

[65] 5 Stat. 797.

[66] 9 Stat. 108.

and the State Constitution expressly continued in force from that time forward all laws of the Republic not repugnant to the Federal or State Constitution or the Joint Resolution of Annexation.[67]

The Government, while conceding that Texas continuously asserted by statute a three-league seaward boundary, contends that at no time before, during, or after admission did the United States or any other country recognize the validity of that boundary. It follows, therefore, the Government says, that since Texas upon entering the Union became subject to the foreign policy of the United States with respect to the "three-mile limit," the State's seaward boundary became immediately and automatically fixed at three miles. Texas, on the other hand, argues that it effectively established, and that the United States repeatedly recognized, the State's three-league boundary before, during, and after admission, and that therefore such a boundary existed "at the time" of its admission within the meaning of the Submerged Lands Act. For reasons already discussed, *ante,* pp. 24–36, we consider that the only relevant inquiry is what boundary was fixed for the State of Texas by virtue of the Congressional action admitting it to the Union in accordance with the terms of the Joint Resolution of March 1, 1845. This inquiry first takes us back to some earlier history.

By the Treaty of Paris, signed April 30, 1803,[68] France ceded to the United States the Louisiana Territory. The extent of the territory thus conveyed was left uncertain, the description in the Treaty referring only to a previous treaty by which France had acquired the territory from Spain, which in turn described the area only as "the colony or province of Louisiana." [69] It was asserted by

---

[67] Texas Const., 1845, Art. Thirteenth, § 2, 2 Gammel, Laws of Texas, at 1299.

[68] 8 Stat. 200.

[69] 13 Cong. Deb., 24th Cong., 2d Sess., Pt. II, at 229.

some that the territory acquired did not stop at the Sabine River—the present boundary between the States of Louisiana and Texas—but extended westward to the Rio Grande so as to include Texas.[70]   However, by the Treaty of February 22, 1819, between the United States and Spain, the boundary line between the two countries was established at the Sabine.[71]   Those who had believed that the Louisiana Territory extended west of the Sabine decried this Treaty as a breach of faith by the United States in violation of the covenant in the 1803 Treaty which required the inhabitants of all the Louisiana Territory to be incorporated as soon as possible into the Union.[72]   Subsequently, the United States attempted unsuccessfully on several occasions to acquire the territory west of the Sabine by purchase.[73]

Meanwhile, Mexico had revolted from Spain, had been recognized by this country in 1822, and had proclaimed a federal constitution in 1824.   Texas was made part of the compound province of Coahuila-Texas, with the indication that it would eventually be given a separate constitution as a sovereign state.   After a series of difficulties with the central government, however, Texas in

---

[70] See, e. g., Cong. Globe, 28th Cong., 1st Sess., App. 540; id., at 697.   The Rio Grande was also sometimes called the Rio Bravo, Rio Bravo del Norte, or Rio Del Norte.   We shall refer to it throughout as the Rio Grande.

[71] 8 Stat. 252.

[72] See Cong. Globe, 28th Cong., 1st Sess., App. 486, 697.

[73] In 1825 and 1827, President Adams and his Secretary of State, Henry Clay, made overtures to Mexico for the acquisition of Texas. See Justin H. Smith, The Annexation of Texas, 8; Cong. Globe, 28th Cong., 1st Sess., App. 698, 768.   Again in 1829 and 1835, President Jackson made similar .overtures.   Smith, op. cit., supra, at 9; Cong. Globe, 28th Cong., 1st Sess., App. 698.   It seems that the Rio Grande was not always sought as the boundary, but that on at least one occasion, Jackson was willing to stop at the center of the desert between the Nueces and the Rio Grande.

1836 proclaimed its own independence from Mexico. It immediately sent diplomatic representatives to the United States to negotiate for annexation, but nothing was consummated at that time.[74] Shortly thereafter, it promulgated the 1836 boundary statute referred to above.

It was against this background that President Tyler negotiated and sent to the Senate the 1844 Treaty for the annexation of Texas. That document provided:

> "The Republic of Texas . . . cedes to the United States all its territories, to be held by them in full property and sovereignty . . . ."[75]

One of the objections made to the Treaty on the floor of the Senate was that it purported to cede to the United States all the territory claimed by Texas under her 1836 Boundary Act, to large parts of which Texas allegedly had no title, those parts assertedly having always been under the domination and control of Spain and Mexico.[76] This objection was countered by several proponents of the Treaty who insisted that since it contained no delineation of boundaries and since the Republic of Texas was referred to by a general designation, the clause "all its

---

[74] See 4 Miller, Treaties and Other International Acts of the United States of America (1934), 139; Justin H. Smith, The Annexation of Texas 1, 7, 20; Cong. Globe, 28th Cong., 1st Sess., App. 697; 1 Garrison, Diplomatic Correspondence of the Republic of Texas, 127, 132–133, H. R. Doc. No. 1282, 60th Cong., 2d Sess. 127, 132–133; letter from Messrs. Van Zandt and Henderson to Secretary of State Calhoun, Apr. 15, 1844, S. Doc. No. 341, 28th Cong., 1st Sess. 13.

[75] S. Doc. No. 341, 28th Cong., 1st Sess. 10.

[76] Speech of Senator Benton of Missouri, Cong. Globe, 28th Cong., 1st Sess., App. 474; Speech of Senator Jarnagin of Tennessee, id., at 685. The contested portions of Texas' claim were the area between the Nueces and Rio Grande Rivers on the southwest, and the area bounded by the upper portion of the Rio Grande in the northwest, which is now part of New Mexico. See diagram at p. 65, post.

territories" ceded only that which properly and rightfully belonged to Texas, its Boundary Act notwithstanding.[77]

The proponents pointed also to a letter of instructions written by Secretary of State Calhoun to the United States Chargé d' Affaires in Mexico a week after the Treaty was signed, which enjoined the latter, in making the Treaty known to Mexico, "to assure the Mexican Government that it is his [the President's] desire to settle all questions between the two countries which may grow out of this treaty, or any other cause, on the most liberal and satisfactory terms, including that of boundary . . . . [The United States] has taken every precaution to make the terms of the treaty as little objectionable to Mexico as possible; and, among others, has left the boundary of Texas without specification, so that what the line of boundary should be might be an open question, to be fairly and fully discussed and settled according to the rights of each, and the mutual interest and security of the two countries." [78]

Despite these controversial aspects of the Treaty, it is quite apparent that its supporters desired to press Texas' boundary claims to the utmost degree possible. President Tyler, in response to the Senate's request, transmitted to it a map showing the western and southwestern boundaries of Texas, and according generally with the Texas Boundary Act.[79] Senator Walker of Mississippi, while insisting that the Treaty ceded "only . . . the country embraced within its [Texas'] lawful boundaries,"

---

[77] Speech of Senator Walker of Mississippi, Cong. Globe, 28th Cong., 1st Sess., App. 548; speech of Senator McDuffie of South Carolina, id., at 529; speech of Senator Breese of Illinois, id., at 540; speech of Senator Buchanan of Pennsylvania, id., at 726; speech of Senator Woodbury of New Hampshire, id., at 768.

[78] S. Doc. No. 341, 28th Cong., 1st Sess. 53, 54.

[79] Id., at 55–57.

asserted that in fact her lawful boundary extended to the Rio Grande, that it had extended that far when she was ceded away by the United States in 1819, that the United States had acquiesced in those boundaries when it recognized Texas in 1837, and that Mexico had never protested the Convention of 1838 which allegedly validated that boundary.[80] Senator Breese of Illinois, while assuring the Treaty's opponents that the boundary was left open to future determination, avowed that the United States had acknowledged the Texas boundaries as asserted in her 1836 statute, and that he was in favor of the recovery not only of the old province of Texas as it existed in 1803 and 1819, but also "for as much more as the 'republic' of Texas can lawfully claim."[81] Senators Woodbury of New Hampshire and Buchanan of Pennsylvania, while expressing doubt about the validity of the Texas Boundary Act to the extent that it claimed portions of New Mexico, thought it was valid so far as it pressed beyond the Nueces to the Rio Grande and ought to be maintained.[82]

After the failure of the Treaty, which would have annexed Texas as a territory of the United States, several proposals were introduced in the next session of Congress for the annexation of Texas by a Joint Resolution admitting it immediately as a State.[83] The doubts which

---

[80] Cong. Globe, 28th Cong., 1st Sess., App. 548.

[81] Id., at 540.

[82] Id., at 768, 726.

[83] Opponents of the proposals objected that since the consent of a foreign nation was required, the object could be accomplished only by an exercise of the treaty-making power, which would bring Texas in as a territory. See, e. g., Cong. Globe, 28th Cong., 2d Sess., App. 367. Supporters of the Resolutions insisted that the express constitutional power of Congress to admit new States on prescribed terms extended to the admission of foreign states as well as of territory already belonging to the United States. See, e. g., id., at 406–407. The measure as finally passed represented a compromise, the Senate having added a § 3, which authorized an alternative proce-

had been raised in 1844 as to the validity of certain Texan pretensions to territory on her western and southwestern frontiers were reiterated during consideration of the various Resolutions, and reference was made to the fact that the rejected Treaty had been assailed as purporting to embrace such territory.[84] In 1844, supporters of the Treaty had considered the general designation "all its territories" as ceding only territory which rightfully, properly, or lawfully belonged to Texas, and as leaving to the Executive the duty of settling the extent of that territory by amicable negotiation.[85] The two clauses of the 1845

---

dure to be pursued by the President, at his election, under the treaty-making power. See Cong. Globe, 28th Cong., 2d Sess. 359, 360, 362–363. President Polk elected not to use that power.

[84] See, *e. g.*, speech of Senator Ashley of Arkansas, Cong. Globe, 28th Cong., 2d Sess., App. 288:

"[T]he present boundaries of Texas I learn from Judge Ellis, the president of the convention that formed the constitution of Texas, and also a member of the first legislature under that constitution, were fixed as they now are, solely and professedly *with a view of having a large margin in the negotiation with Mexico,* and not with the expectation of retaining them as they now exist in their statute book." (Emphasis in original.)

See also speech of Representative Brinkerhoff of Ohio, Cong. Globe, 28th Cong., 2d Sess. 346–347. Significantly, the House of Representatives on Jan. 16, 1845, passed a Resolution calling on the President to communicate any information he might possess on the territory within which the authority and jurisdiction of the Republic of Texas was recognized by its inhabitants. *Id.,* at 147.

[85] Speech of Senator McDuffie of South Carolina, Cong. Globe, 28th Cong., 1st Sess., App. 530: "[T]he treaty neither does convey, nor is intended to convey, one solitary square foot of land which does not *rightfully* belong to Texas." (Emphasis added.) Speech of Senator Walker of Mississippi, *id.,* at 548: "[W]hen [a nation] is ceded by name, that cession extends only to the country embraced within its *lawful* boundaries. If, then, the Del Norte . . . be the *proper* boundary, then it is and ought to be included." (Emphasis added.) See also Speech of Senator Buchanan of Pennsylvania, *id.,* at 726; speech of Senator Breese of Illinois, *id.,* at 540.

44

Annexation Resolution (*ante*, p. 37) appear, against this background, to be an express formulation of precisely the same thing. The first makes it clear that the grant is of initially undefined scope, governed by the truism that only "the territory properly included within, and rightfully belonging to the Republic of Texas" is ceded. The second expressly contemplates future negotiation to settle the exact extent of such territory, by making it "subject to the adjustment by this government of all questions of boundary that may arise with other governments." In short, it is clear that the "properly" and "rightfully" clause was intended neither as a legislative determination that the entire area claimed by Texas was legitimately hers, nor to serve, independently of the "adjustment" clause, as a self-operating standard for measuring Texas' boundaries. Rather, the precise fixation of the new State's boundaries was left to future negotiations with Mexico.

The circumstances surrounding the Resolution's passage make it clear that this was the understanding of Congress. Congressional attention was focused primarily on the great political questions attending annexation—primarily the extent to which slavery would be permitted in the new territory and the possibility that annexation would embroil this country with Mexico—and the matter of boundary received little consideration except as it was related to the larger issues. Public agitation over annexation had become so great that some bills had proposed annexation virtually in the abstract, with all details to be worked out later.[86] Although the Resolution as ulti-

---

[86] Representative Rhett of South Carolina proposed that "the sense of the . . . [House] be taken on the first number in the series of resolutions, which simply declared that Texas should be annexed to the United States." He did not "feel very scrupulous as to the particular means, provided Texas was got; and have it they would." Cong. Globe, 28th Cong., 2d Sess., App. 55. See also remarks of

mately passed did settle the details of certain matters—notably slavery, the Texan debt, and the mode of annexation—the manifest purport of it and all the many other annexation bills introduced was to postpone the fixing of boundaries for the sake of achieving immediate annexation, and no apparent importance was attached to the particular verbal formula used to achieve such postponement.[87]  The general tenor of opposition to annexation

---

Representative Ingersoll, Chairman of the Committee on Foreign Affairs, which had reported on the subject of annexation, objecting to this procedure, *ibid.*, and those of Senator Dayton of New Jersey, *id.*, at 387.

[87] The bills introduced included the following variations in treatment of the boundary question:

"That the republic of Texas . . . be received and admitted . . . . That the United States be authorized to adjust and settle all questions of boundary which may arise with other governments." (Offered by Senator Ashley of Arkansas, Cong. Globe, 28th Cong., 2d Sess., App., at 287–288.)

"The republic of Texas . . . cedes to the United States all the territories of Texas . . . ." (Reported by Representative Ingersoll as Chairman of the Committee on Foreign Affairs, Cong. Globe, 28th Cong., 2d Sess., at 191.)

"[T]he territory now known as the republic of Texas be, and the same is hereby, annexed to, and made a portion of, the territory of the United States. . . . That commissioners shall hereafter be appointed, who shall establish the boundaries . . . ." (Offered by Representative Weller of Ohio, *id.*, at 192.)

"That the Congress doth consent that the territory rightfully included within the limits of Texas be erected into a new State . . . . That said State be formed subject to the adjustment, by the government of the United States, of all questions of boundary that may arise with other governments." (Offered by Representative Douglass of Illinois, *id.*, at 192.)

"That the Congress doth consent that the territory known as the republic of Texas, and rightfully belonging to the same, may be erected into a new State . . . . That the President of the United States, by and with the advice and consent of the Senate, is hereby authorized to adjust and settle all questions relating to the boundaries

changed from a fear that the cession covered too much to criticisms of the indefinite treatment of boundary and concern over whether Texas really owned as much as some supporters asserted.[88] It is true that isolated statements were made which seem to indicate that the speaker thought the Resolutions would admit Texas with the boundary defined in her 1836 boundary statute, subject to possible subsequent readjustment.[89] However, read in

of said territory, which may arise with other governments." (Offered by Representative Burke of New Hampshire, *ibid.*)

There were also several proposals to carve a State out of only part of the Texan territory, with assigned territorial boundaries, and to admit the remainder as a territory subject to later adjustment of boundaries. Cong. Globe, 28th Cong., 2d Sess. 76 (Representative Tibbatts of Kentucky); 107, 187, App. 304 (Representative Dromgoole of Virginia); 192 (Representative Robinson of New York); 359 (Senator Walker of Mississippi); 362 (Senator Miller of New Jersey).

[88] See, *e. g.*, Cong. Globe, 28th Cong., 2d Sess., App. 387, 400. The maintainable extent of Texas' territory was crucial for two reasons: first, because it had been proposed that the United States assume the Texan debt and that Texas cede all her vacant and unappropriated public lands to be applied in discharge of the debt; second, because it had been proposed that several States be carved out of the Texan territory, those lying south of latitude 36 degrees 30 minutes—the Missouri compromise line—to be slave States, and those to the north to be free States. In this context, it was repeatedly asserted by opponents of the Annexation Resolutions that by their terms, the United States would not get nearly as much public land as the Texas Boundary Act would indicate, nor any land north of the Missouri compromise line, despite the Act's claim of a boundary extending to the 42d parallel. See, *e. g.*, Cong. Globe, 28th Cong., 2d Sess. 191 (Representative McIlvaine of Pennsylvania); *id.*, App. 369–370 (Representative Severance of Maine).

[89] Representative Hudson of Massachusetts said:

"What is the Texas which we propose to take into our embrace? Not simply the old province of Texas—not the Texas which declared itself independent, and whose independence we and several other nations have recognised—not Texas proper, but a large amount of

context, these statements may have meant no more than that the United States, in its negotiations with Mexico, would attempt to sustain the full extent of Texas' declared boundaries, rather than that those boundaries were in fact proper. Be that as it may, in view of the overwhelming evidence of Congressional understanding and of the express language of the Annexation Resolution as ultimately passed, the conclusion is inescapable that Texas, at least as to its land area, was admitted with undefined boundaries subject to later settlement.

While this conclusion appears unavoidable as regards Texas' land boundaries, a question does exist as to whether it applies also to the State's seaward boundary. For we are unable to find in the Congressional debates either on the 1844 Treaty or the 1845 Annexation Resolution a single instance of significant advertence to the problem of seaward boundaries. Furthermore, a series of other events manifests a total lack of concern with the problem. Prior to Texan independence, the United States had entered into successive treaties with Spain and Mexico,[90] which provided that

> "The boundary line between the two countries, west of the Mississippi, shall begin *on the Gulph of Mexico, at the mouth of the river Sabine,* in the sea, continuing north along the western bank of that river . . . ." (Emphasis added.)

---

territory which is not included in Texas—territory over which Texas never extended her conquest or jurisdiction, and which is as much a part of Mexico as the city of Mexico itself." Cong. Globe, 28th Cong., 2d Sess., App. 336.

See also remarks of Representative Rayner of North Carolina, *id.,* 411–412, see note 98, *infra;* and of Representative Haralson of Georgia. *Id.,* App. 195, see note 97, *infra.*

[90] Treaty of Amity, Settlement, and Limits, Feb. 22, 1819, 8 Stat. 252; Treaty of Limits, Jan. 12, 1828, 8 Stat. 372.

48

Just after Texas had proclaimed its independence from Mexico, the two countries, on May 14, 1836, concluded "Articles of Agreement and Solemn Compact," acknowledging Texan independence and setting its boundary as follows:

> "The line shall commence *at the estuary or mouth of the Rio Grande,* on the western bank thereof, and shall pursue the same bank up the said river . . . ." [91] (Emphasis added.)

Thereafter a minister was sent to the United States to seek recognition and broach the subject of annexation. With respect to the latter, he was instructed on November 18, 1836:

> "As regards the boundaries of Texas . . . [w]e claim and consider that we have possession to the Rio Bravo del Norte. Taking this as the basis, the boundary of Texas would be as follows. Beginning *at the mouth of said River on the Gulf of Mexico,* thence up the middle thereof . . . ." [92] (Emphasis added.)

Yet a month later, on December 19, 1836, the Texan Congress passed the Boundary Act which inexplicably, so far as we can find, provided that the boundary should run along the Gulf of Mexico at three leagues from land. [93]

---

[91] This compact was alluded to during the debates on the unsuccessful 1844 Treaty as having probably provided the origin of the boundary claims made in the Texas 1836 boundary statute. See Cong. Globe, 28th Cong., 1st Sess., App. 700, 768.

[92] 1 Garrison, Diplomatic Correspondence of the Republic of Texas, 127, 132, reprinted as H. R. Doc. No. 1282, 60th Cong., 2d Sess. 127, 132.

[93] On Dec. 22, 1836, President Jackson sent a message to the House regarding possible recognition of Texas. One of the documents

Quite in contrast, in the subsequent Convention of 1838 to establish the boundary between the United States and Texas, Texas reaffirmed the 1819 and 1828 Treaties with Spain and Mexico regarding that boundary and agreed to the running and marking of

> "that portion of the said boundary which extends from *the mouth of the Sabine, where that river enters the Gulph of Mexico,* to the Red river." [94]    (Emphasis added.)

Again, as previously mentioned (note 79, *ante*), during its consideration of the unratified Treaty of April 12, 1844, the Senate requested President Tyler to transmit any information he possessed concerning the southern, southwestern, and western boundaries of Texas.   On April 26, 1844, he sent a map and a memoir by its compiler.   The memoir flagrantly misquoted the 1836 Boundary Act by

accompanying the message was a report dated Aug. 27, 1836, in which the Texan boundary was described as

"extend[ing] from *the mouth of the Rio Grande* on the east side, up to its head waters; thence on a line due north until it intersects that of the United States, and with that line to the Red river, or the northern boundary of the United States; thence to the Sabine, and along that river *to its mouth; and from that point westwardly with the Gulf of Mexico to the Rio Grande."* H. R. Exec. Doc. No. 35, 24th Cong., 2d Sess. 11.   (Emphasis added.)

While this report was written before the Texas boundary statute was passed, it again illustrates the lack of concern over a seaward boundary.

[94] Convention Between the United States of America and the Republic of Texas, for marking the boundary between them, Apr. 25, 1838, 8 Stat. 511.   The Journal of the Joint Commission which conducted the survey stated:

"[W]e established the point of beginning of the boundary between the United States and the republic of Texas at a mound on the western bank of the junction of the river Sabine with the sea . . . ." S. Doc. No. 199, 27th Cong., 2d Sess. 59.

describing the Texas boundary as " 'Beginning at the mouth of the Rio Grande, thence up the principal stream of said river . . . .' " [95]

The foregoing circumstances make it abundantly plain that at the time Texas was admitted to the Union, its seaward boundary, though expressly claimed at three leagues in the 1836 Texas Boundary Act, had not been the subject of any specific concern in the train of events leading to annexation.

Given this state of affairs, we must initially dispose of an argument made by Texas. The State urges, in effect, that whether or not its maritime boundary was actually considered by the Congress or the Executive during the course of the annexation proceedings, it was incumbent upon the United States to protest or reject in some manner Texas' claim in this regard, and that failure to do so constituted in law a validation or ratification of that boundary claim upon admission. Whatever the merit of this proposition may be in the abstract, the controlling factor for purposes of this case must be the terms of the Joint Resolution of Annexation. There is, indeed, a strong argument that the "properly," "rightfully," and "adjustment" clauses of that Resolution should be read as applying only to the land boundaries disputed with Mexico, which gave rise to those qualifications, and that the Resolution was meant to validate any boundary asserted by Texas without protest. However, in light of the fact that the language employed in the Resolution is of general applicability, we should hesitate to limit its effect by reading into it such an additional unexpressed test respecting the extent of Texas' boundaries. We think that its language must be taken as applying to Texas' maritime boundary as well as to its land boundary.

[95] S. Doc. No. 341, 28th Cong., 1st Sess. 55, 56.

On this basis an argument of the Government must now be met. It is contended that since Texas was admitted to the Union with its maritime boundary not yet settled, United States foreign policy on the extent of territorial waters, to which Texas was admittedly subject from the moment of admission, automatically upon admission operated to fix its seaward boundary at three miles. This contention must be rejected. As we have noted, the boundaries contemplated by the Submerged Lands Act are those fixed by virtue of Congressional power to admit new States and to define the extent of their territory, not by virtue of the Executive power to determine this country's obligations *vis-à-vis* foreign nations. *Ante,* pp. 30–36. It may indeed be that the Executive, in the exercise of its power, can limit the enjoyment of certain incidents of a Congressionally conferred boundary, but it does not fix that boundary. If, as in the case of Texas, Congress employs an uncertain standard in fixing a State's boundaries, we must nevertheless endeavor to apply that standard to the historical events surrounding admission.

We are brought back, then, to a twofold inquiry: First, whether the three-league maritime boundary asserted by the Republic of Texas embraced an area which was "properly included within, and rightfully belonging to" the Republic. Second, whether such a boundary was ever fixed for the State of Texas pursuant to the power reserved by Congress to adjust "all questions of boundary that may arise with other governments." As we have observed, it is evident that the first clause, independently of the second, was not intended to operate as a self-executing standard for determining the disputed western and southwestern boundaries of Texas. To attempt to apply that clause as fixing the extent of Texas' maritime boundary, immediately upon admission to the Union, no less than in so fixing its land boundaries, would be illusory at best. The parties devote consider-

able discussion to the validity or invalidity of the asserted three-league maritime boundary under international law. It is true that the propriety of a nation's seaward boundary must be viewed in the context of its obligations *vis-à-vis* the family of nations. But surely the Joint Resolution of Annexation could not have been meant to import such an elusive inquiry into the determination of Texas' maritime boundary, especially when that question was never even considered and when the Resolution was expressly drawn to leave undefined the land boundaries which did receive consideration. And we are unable to say that Congress might have deemed the three-league maritime boundary "proper" or "rightful" in some other sense. It is necessary, therefore, to look to other events to ascertain where the Texan maritime boundary was fixed pursuant to the Joint Resolution of Annexation.

Congress' failure to carry into the Annexation Resolution the boundaries fixed by the 1836 Texas Boundary Act did not, of course, foreclose the possibility that the State's boundary might ultimately be fixed in accordance with that statute. It is significant in this regard to note the opinions ventured in Congress on the probable settlement of the boundary with Mexico which would occur subsequent to annexation. One group asserted that the Texan claims to the Rio Grande, particularly the portion which encompassed New Mexico, could not possibly be maintained.[96] But such remarks were made primarily by opponents of annexation and were intended as warnings against assuming that enough land would be included in the cession to pay the Texan debt or to form free States. Much more significant than opinions as to where the boundary might ultimately be *fixed* are observations made

---

[96] See, *e. g.*, speech of Representative Severance of Maine, Cong. Globe, 28th Cong., 2d Sess., App. 369–370; speech of Representative McIlvain of Pennsylvania, *id.*, at 373.

regarding the basis on which the boundary question might be *pressed* against Mexico. Supporters and opponents alike acknowledged that the United States would probably negotiate on the basis of the Texan boundaries as declared in her own boundary statute, even though some parts of that boundary might not be maintainable. Some thought this was so because those boundaries were in fact her proper and rightful boundaries.[97] Others thought it was so because the United States, having acquiesced in the Boundary Act after receiving notice of it, was bound, upon admitting Texas to the Union, to maintain those claims on her behalf.[98] Whatever the reasons given, it is

---

[97] Representative Haralson of Georgia, speaking to the Joint Resolution, said:

"If it should turn out that, by receiving the entire limits of Texas, as defined in her act, we acquired more territory than we could rightfully hold, having a just regard to the rights of other nations, all that is necessary to be done is to surrender the overplus. The Texian act of Congress, approved December 19, 1836, I have little doubt, defines correctly the boundary of that republic. If not, any imaginable difficulty may be adjusted if you adopt one of these resolutions, which provides for the consent of Texas to our settlement of the boundaries." Cong. Globe, 28th Cong., 2d Sess., App. 193, 195.

[98] Representative Rayner of North Carolina, speaking to the Joint Resolution, said:

"Texas claims the country on the east of the Del Norte, from its mouth to its source. She has laid down this as her boundary in her constitution. She is to transfer to this government, or retain to herself, all the unappropriated lands within the limits of her republic. She has defined these limits; and it is with Texas, claiming territory as extending to the Del Norte in its whole length, that you propose to make the contract. It may be said that this question of boundary must be left to future negotiation with Mexico. But will not this government, if Texas is now annexed, with her definition of boundary, be precluded from making any concessions to Mexico? Will not any compromise as to boundary be resisted by Texas as a breach of faith towards her? She might say that Texas had defined her own limits; that with Texas, as thus bounded, we had contracted for her admission into the Union; and that this government was bound by every

clear that Congress, although it purposely refused to settle the question, anticipated that the Texas Boundary Act should and would be insisted on to the greatest degree possible in negotiations with Mexico.

This prediction was borne out by subsequent events. After the Annexation Resolution had been passed and transmitted to Texas for its assent, the Mexican army threatened to cross the Rio Grande and invade Texas. On June 15, 1845, President Polk wrote an informal and confidential letter to the United States Chargé d'Affaires in Texas which indicated that Polk intended to repel such an invasion and to maintain the Texan claim at least to the lower portion of the Rio Grande:

> "In the contingency . . . that a Mexican army should cross—the Rio Grande . . . then in my judg-

---

consideration of faith and honor to see that Texas should not be again mutilated. . . .

"Whether this reasoning be founded in justice or not, there is some plausibility in it . . . ." *Id.*, at 410, 411–412.

Similarly Senator Breese of Illinois, speaking to the 1844 Treaty, had said:

"The limits of Texas are to be adjusted hereafter. But we have acknowledged the limits as defined in the act of the Texian Congress of 1836, and as delineated on the map accompanying the documents, as extending to the Del Norte. And why do I say so? Because we did, in 1837, with a full knowledge of these declared boundaries, acknowledge the independence of Texas as a state, with that act of her Congress then, and as now, in full force; and which acknowledgment received the vote of the senator from Missouri. But this is a small matter, and can be readily adjusted with Mexico, should we encroach upon her rights. We get a title to all Texas, rightfully ours in virtue of her sovereignty. We ask no more—no less.

"The senator says that he is for the recovery of [t]he province of Texas—Spanish Texas—the Texas of La Salle. So am I, Mr. President; and for as much more as the 'republic' of Texas can lawfully claim." Cong. Globe, 28th Cong., 1st Sess., App. 537, 540.

Senator Walker of Mississippi, commenting on the 1844 Treaty, had placed his approval of the Boundary Act on both grounds. *Id.*, at 548–557.

ment,—the public necessity for our interposition—
will be such,—that we should not stand—quietly
by—and permit—an invading foreign enemy—either
to occupy or devastate any portion of the Texian ter-
ritory. Of course I would maintain the Texan title
to the extent which she claims it to be, and not per-
mit an invading enemy—to occupy a foot of the soil
East of the *Rio Grande."* Andrew Donelson Papers
(Library of Congress), Vol. 10, folios 2068–2070.

Nine days before, Polk had manifested a similar inten-
tion in a letter to Sam Houston, former President of the
Republic of Texas and an influential spokesman for
annexation:

"You may have no apprehensions in regard to your
boundary. Texas once a part of the Union and we
will maintain all your rights of territory and will not
suffer them to be sacrificed." Polk Papers (Library
of Congress) (1845), Vol. 84.

The attitude of the Executive at this time toward the
Texan boundary is made even more explicit by an account
of an interview between the United States Chargé
d'Affaires in Texas and Sam Houston, written by the
former to his superior, the Secretary of State:

"I stated at large the general policy of the United
States as justifying no doubt of the tenacity with
which they would maintain not only the present
claim of Texas, but reenforce it with the preexisting
one derived from France in 1803 . . . .

"I brought also to his view the fact that this latter
feature of the proposals did not interfere with the
right of Texas to define her limits as she claimed
them, in her statutes—that the specification of the
Rio Grande as the western boundary would be proper
enough as shewing the extent to which the United
States would maintain her claim as far as it could be

done without manifest injustice to Mexico, and to the portion of the inhabitants of Mexico that had never yet acknowledged the jurisdiction of Texas—that practically the United States would take the place of Texas, and would be obligated to do all, in this respect, that Texas could do, were she to remain a separate nation." [99]

After Texas consented to annexation and Congress had finally admitted her to statehood, the Mexican army crossed the Rio Grande and declared war upon the United States. On May 11, 1846, President Polk called on Congress to declare war against Mexico. He said in part:

"Texas, by the final action of our Congress, had become an integral part of our Union. The Congress of Texas, by its act of December 19, 1836, had declared the Rio del Norte to be the boundary of that republic. Its jurisdiction had been extended and exercised beyond the Nueces. The country between that river and the Del Norte had been represented in the congress and in the convention of Texas; had thus taken part in the act of annexation itself; and is now included within one of our congressional districts. Our own Congress had, moreover, with great unanimity, by the act approved December 31, 1845, recognized the country beyond the Nueces as a part of our territory, by including it within our own revenue system; and a revenue officer, to reside within that district, has been appointed, by and with the advice and consent of the Senate. It became, therefore, of urgent necessity to provide for the defence of that portion of our country." H. R. Exec. Doc. No. 60, 30th Cong., 1st Sess. 4, 7.

[99] Letter from Andrew J. Donelson to James Buchanan, Apr. 12, 1845, 12 Manning, Diplomatic Correspondence of the United States: Inter-American Affairs, 1831–1860 (1939), 400–401.

In a later message to Congress on December 8, 1846, Polk manifested the same disposition. H. R. Exec. Doc. No. 4, 29th Cong., 2d Sess. 13–14. And on December 7, 1847, he explained that the United States had rejected a treaty proposal by Mexico because

"It required the United States to dismember Texas, by surrendering to Mexico that part of the territory of that State lying between the Nueces and the Rio Grande, included within her limits by her laws when she was an independent republic, and when she was annexed to the United States and admitted by Congress as one of the States of our Union." H. R. Exec. Doc. No. 8, 30th Cong., 1st Sess. 9.

However, there is absolutely nothing to indicate that the Executive, any more than the Congress, was interested in, or was at all aware of any problem presented by, the seaward boundary of Texas as claimed in its 1836 Boundary Act. The Government urges, by way of explanation, that the United States had, by this time, firmly established a policy of claiming no more than three miles of territorial waters. But the Executive's responsibility for fixing the Texan boundary derived from a delegation of Congressional power to admit new States, not from the Executive's own power to fix the extent of territorial waters. As we have already pointed out, the two powers can operate independently, and only the first is determinative in this case. To the extent it may be argued that the Executive would naturally take account of its own policy toward territorial waters in fixing the Congressionally mandated boundary, the data presented to us are utterly devoid of any suggestion that such was the case. On the contrary, it is evident that the overwhelming concern of the President and his subordinates was to maintain to the greatest extent possible the land boundaries claimed by Texas and disputed with Mexico,

as anticipated by Congress. The settlement of that matter remained for future events, to which we now turn.

On April 15, 1847, Nicholas P. Trist was appointed Commissioner to Mexico to negotiate a peace treaty. Among his instructions was a projet of the proposed treaty, which provided:

> "The boundary line between the two Republics shall commence in the Gulf of Mexico *three leagues from land opposite the mouth of the Rio Grande,* from thence up the middle of that river . . . ." 5 Miller, Treaties and Other International Acts of the United States of America (1937), 265. (Emphasis added.)

This language was incorporated verbatim into Article V of the Treaty of Guadalupe Hidalgo as finally signed on February 2, 1848, 9 Stat. 922, which fixed the boundary between the United States and Mexico from the Gulf of Mexico to the Pacific coast.[100] While there was con-

---

[100] The treaty provided as follows:

"The boundary line between the two republics shall commence in the Gulf of Mexico, three leagues from land, opposite the mouth of the Rio Grande, otherwise called Rio Bravo del Norte, or opposite the mouth of its deepest branch, if it should have more than one branch emptying directly into the sea; from thence up the middle of that river, following the deepest channel, where it has more than one, to the point where it strikes the southern boundary of New Mexico; thence, westwardly, along the whole southern boundary of New Mexico (which runs north of the town called *Paso*) to its western termination; thence, northward, along the western line of New Mexico, until it intersects the first branch of the river Gila; (or if it should not intersect any branch of that river, then to the point on the said line nearest to such branch, and thence in a direct line to the same;) thence down the middle of the said branch and of the said river, until it empties into the Rio Colorado; thence across the Rio Colorado, following the division line between Upper and Lower California, to the Pacific Ocean."

By this treaty, the United States thus not only maintained the Texan claim to the territory between the Nueces and the Rio Grande, but also acquired from Mexico the whole of New Mexico, part of which Texas had claimed by its boundary statute. To settle the

siderable disagreement in the negotiations over the various land boundaries, the proposals of both parties never departed from the three-league provision. See 5 Miller, *op. cit., supra,* at 270, 288, 299, 315, 317, 325.

Trist stated in his notes that one object of instructions given to his predecessor, substantially identical in relevant part to those given him, was to get Mexico to agree to a boundary which

"would throw within the territory of the United States the country lying east of the Rio Grande. Or,

conflict thus created between the United States and Texas to that portion of New Mexico, the United States in 1850 paid Texas $10,000,000 to relinquish its claim to the area, 9 Stat. 446, thereby consummating the final step in the establishment of Texas' disputed land boundaries. See diagram, p. 65, *post.*

The Act provided as follows:

"The State of Texas will agree that her boundary on the north shall commence at the point at which the meridian of one hundred degrees west from Greenwich is intersected by the parallel of thirty-six degrees thirty minutes north latitude, and shall run from said point due west to the meridian of one hundred and three degrees west from Greenwich; thence her boundary shall run due south to the thirty-second degree of north latitude; thence on the said parallel of thirty-two degrees of north latitude to the Rio Bravo del Norte, and thence with the channel of said river to the Gulf of Mexico."

It is suggested that the seaward boundary of Texas was thereby fixed at the edge of the Gulf. But Texas' western boundary south of New Mexico had already been definitively fixed by the Treaty of Guadalupe Hidalgo. *Post,* pp. 60–61. Since the treaty had fully supported Texas' claim to that area, there was nothing to compromise in 1850. By contrast, the portion of the 1848 boundary which encompassed not only eastern New Mexico, to which Texas had a very doubtful claim, but also western New Mexico and California, which it had never claimed, obviously was not pressed against Mexico on Texas' behalf and was not intended to validate its claim to eastern New Mexico. Thus the 1850 Compromise could be concerned only with the latter area. Nothing in *United States* v. *Texas,* 162 U. S. 1, militates to the contrary. The concluding phrase of the Act, describing the portion of Texas' boundary south of New Mexico was unnecessary to the purposes of the Act and could not, without Texas' consent, affect the seaward boundary previously fixed for it.

as said object stands in said instructions, specifically stated & expressed, it was the object of prevailing upon Mexico 'to agree that the line shall be established along the boundary defined by the act of Congress of Texas, approved December 19, 1836, to wit: beginning at "the mouth of the Rio Grande; thence up the principal stream of said river . . . ." ' " [101]

While this misquotation of the Texas Boundary Act again demonstrates total insensitivity to any problem of a seaward boundary, the passage does indicate that the United States was attempting to follow the Texan statute in negotiating the boundary.[102] More important for the purposes of this case are the circumstances that the three-league provision was made an express part of the Treaty of Guadalupe-Hidalgo, that such boundary was reaffirmed five years later in the Gadsden Treaty of December 30, 1853 [103] and subsequently in a long line

---

[101] Papers of Nicholas P. Trist (Library of Congress 1917), Vol. 33, folio 62071. The quotation is from letter of Secretary of State Buchanan to John Slidell, Nov. 10, 1845. S. Exec. Doc. No. 52, 30th Cong., 1st Sess. 78.

[102] See also 5 Miller, *op. cit., supra,* at 315, n. 1. While the United States demanded and obtained as a war indemnity a large amount of territory west of Texas' claimed boundaries extending to the Pacific coast, see note 100, *supra,* that fact never obscured this country's firm contention that as to Texas' *southwestern* boundary—lying along the Rio Grande from the Gulf to what is now New Mexico—the Texan claim based on its 1836 Boundary Act must be maintained against Mexico.

[103] 10 Stat. 1031. It is noteworthy that the boundary commissioners appointed at that time to survey the three-league boundary reported: "Lieut. Wilkinson, in command of the brig Morris, repaired at the appointed time to the mouth of the river and made soundings . . . to trace the boundary, as the treaty required, 'three leagues out to sea.' " 1 Emory, Report on the United States and Mexican Boundary Survey (1857), 58. This is in marked contrast to the notes of the surveyors of the boundary between Texas and the United States established by the 1838 Convention. See note 94, *supra.*

of international conventions,[104] and that it has never been repudiated.

The Treaty unquestionably established the Rio Grande from New Mexico to the Gulf as the land boundary not only of the United States but also of Texas, since the Executive, acting pursuant to the power given by Congress to "adjust" Texas' boundaries in dealings with other nations, pressed that boundary against Mexico on the theory that it embraced territory rightfully belonging to the State of Texas. There is nothing to indicate that the extension of that boundary three leagues into the Gulf, pursuant to the very same Boundary Act, was treated on any different basis. The portion of the boundary extending into the Gulf, like the rest of the line, was intended to separate the territory of the two countries, and to recognize that the maritime territory of Texas extended three leagues seaward.

Whether the Treaty be deemed to constitute an exercise of the power to adjust the boundaries left unsettled by the 1845 Joint Resolution of Annexation, or a *post hoc* recognition of a seaward boundary which was actually fixed for Texas upon its admission in 1845, or a fixation of boundaries which related back to the time of admission, is of no moment. Although the Submerged Lands Act requires that a State's boundary in excess of three miles must have existed "at the time" of its admission, that phrase was intended, in substance, to define a State's present boundaries by reference to the events surrounding its admission. As such, it clearly includes a boundary which was

---

[104] See the following boundary conventions between the United States and Mexico: July 29, 1882, 22 Stat. 986; Nov. 12, 1884, 24 Stat. 1011; Dec. 5, 1885, 25 Stat. 1390; Feb. 18, 1889, 26 Stat. 1493; Mar. 1, 1889, 26 Stat. 1512; Aug. 24, 1894, 28 Stat. 1213; Oct. 1, 1895, 29 Stat. 841; Nov. 6, 1896, 29 Stat. 857; Oct. 29, 1897, 30 Stat. 1625; Dec. 2, 1898, 30 Stat. 1744; Nov. 21, 1900, 31 Stat. 1936; Mar. 20, 1905, 35 Stat. 1863.

fixed pursuant to a Congressional mandate establishing the terms of the State's admission, even though the final execution of that mandate occurred a short time subsequent to admission.

The Government contends that the Treaty of Guadalupe Hidalgo is of no significance in this case because the line drawn three leagues out to sea was not meant to separate territory of the two countries, but only to separate their rights to exercise certain types of "extraterritorial" jurisdiction with respect to customs and smuggling. We believe the conclusion is clear that what the line, denominated a "boundary" in the Treaty itself, separates is territory of the respective countries. No reference to "extraterritorial" jurisdiction is made in the Treaty, and no such concept can be gleaned from the context of the negotiations. Being based on the three-league provision of the 1836 Texas Boundary Act, which itself denotes a territorial boundary, the obvious and common-sense meaning of the analogous treaty provision is that it separates the maritime territory of the United States and Mexico.

The Government relies on certain diplomatic correspondence as evidencing a subsequent construction of the Treaty contrary to this conclusion. In 1848, when Great Britain protested the three-league provision of the Treaty, both the United States and Mexico replied that the Treaty defined rights only as between the two countries and was not intended to impair the rights of any other nation in the marginal sea.[105] In 1875, Secretary of State Hamilton Fish made a similar explanation to Lord Derby of Eng-

---

[105] Letter of Secretary of State Buchanan to Mr. Crampton, British Minister, Aug. 19, 1848, Manning, Diplomatic Correspondence of the United States, Inter-American Affairs, 1831–1860, VII, 31–32; Letter from Luis G. Cuevas, Mexican Foreign Minister, to Percy W. Doyle, British Chargé d'Affaires in Mexico, photostatic copy of translation in Public Record Office, London, Gov. Br. p. 403.

land, but added a new contention that the boundary pro-
vision was "probably" suggested by the Acts of Congress
permitting revenue officials to board vessels bound for the
United States within four leagues of the coast.[106]   And in
1936, after Mexico had asserted a three-league belt of
territorial water along its entire coast, the United States,
in denying that the Treaty gave Mexico such a right,
adopted both rationales relied on in 1875, and in addition
contended that the boundary provision did recognize the
territory of the two countries as extending three leagues
from the coast, but only in the "one area" adjacent to the
international boundary.[107]   It seems evident from the

[106] Foreign Relations of the United States, 1875, Pt. I, 649–650. It
is difficult to understand why, if jurisdiction for revenue purposes
had been extended by statute to four leagues, the boundary was
established only at three leagues if it was drawn solely for that
purpose. It is asserted, however, that Mexico concluded a series of
treaties with other countries in the latter half of the nineteenth cen-
tury which established jurisdiction for revenue purposes at three
leagues. Treaty between Mexico and China, Art. XI, 1 Laws and
Regulations on the Regime of the High Seas (United Nations Legis-
lative Series) 147; Treaty between Mexico and the Dominican Re-
public, Art. 15, id., at 153, 154; Treaty between Mexico and El
Salvador, Art. XXI, id., at 156; Treaty between Mexico and France,
Art. 15, id., at 169, 170; Treaty between Mexico and Germany, Art.
VIII, id., at 170; Treaty between Mexico and the Netherlands, Art.
6, id., at 171; Treaty between Mexico and Norway and Sweden,
Art. VII, id., at 171–172; Treaty between Mexico and the United
Kingdom, Art. IV, id., at 172. Only some of those Treaties set the
limit at three leagues; others set it at twenty kilometers, which is
equivalent to approximately 10.8 nautical miles, or closer to four
leagues than to three. In any event, the Mexican Treaties indicate
only that Mexico chose to limit the rights she would assert as against
other nations, and do not relate to the rights created between it
and the United States by the Treaty of Guadalupe Hidalgo.

[107] Letter from Mr. De L. Boal, American Chargé d'Affaires ad
interim at Mexico City, to Senor General Hay, Mexican Minister for
Foreign Affairs, June 3, 1936, 99 Cong. Rec. 3623–3624.

shifting and uncertain grounds upon which these pronouncements relied that they should be taken as reflecting no more than after-the-fact attempts to limit the effect of a provision which patently purported to establish a three-league territorial boundary, so as to bring it into accord with this country's international obligations. Undoubtedly the Executive has the right to limit the effect to be accorded a treaty provision in its dealings with other countries. But where, as here, that Treaty touches upon relationships between the Nation and a State created pursuant to a Congressional mandate, the original purport of the Treaty must control, and the dealings of the Executive with other nations cannot affect the State's rights in any way as a domestic matter.

We conclude, therefore, that pursuant to the Annexation Resolution of 1845, Texas' maritime boundary was established at three leagues from its coast for domestic purposes. Of course, we intimate no view on the effectiveness of this boundary as against other nations. Accordingly, Texas is entitled to a grant of three leagues from her coast under the Submerged Lands Act.

---

In testifying before Congress on the Submerged Lands Act, representatives of the State Department reiterated these various grounds, 1953 Senate Hearings 1056–1057, 1077–1078. See also *id.*, at 321–323, 670; 99 Cong. Rec. 2513–2514, 2569, 2893–2895, 3041–3042. Their concern was to avert a congressional determination that a three-league territorial boundary had been fixed for Texas which might be embarrassing to this country in its foreign relations. However, as we have pointed out, pp. 30–36, *ante,* there is no necessary conflict between the existence of a three-league territorial boundary for domestic purposes and the maintenance of the Executive's policy on the limit to which this country will assert rights in the marginal seas as against other nations. Despite the State Department's contentions with respect to the Treaty, Congress clearly left that question, like all other matters bearing on the determination of boundaries, an open question to be judicially resolved.

## BOUNDARIES CLAIMED BY TEXAS.*

*United States Department of the Interior, Boundaries, Areas, Geographic Centers, and Altitudes of the United States and the Several States, Second Edition, 1932, Edward M. Douglas, Editor, Geological Survey Bulletin 817, p. 170.

66

## III.

### THE PARTICULAR CLAIMS OF LOUISIANA.

Louisiana's claims, like those of Texas, are based on the contention that it had a three-league maritime boundary which existed "at the time" it was admitted to the Union, and must be judged by the same standards. The Act of Congress admitting the State to the Union in 1812 [107a] described the new State's boundaries as follows:

> "beginning at the mouth of the river Sabine; thence, by a line to be drawn along the middle of said river, including all islands to the thirty-second degree of latitude; thence, due north, to the northernmost part of the thirty-third degree of north latitude; thence, along the said parallel of latitude, to the river Mississippi; thence, down the said river, to the river Iberville; and from thence, along the middle of the said river, and lakes Maurepas and Ponchartrain, *to the gulf of Mexico; thence, bounded by the said gulf, to the place of beginning, including all islands within three leagues of the coast* . . . ." (Emphasis added.)

Louisiana claims that the concluding clause "including all islands within three leagues of the coast" should be read to mean that Congress fixed as the State's seaward boundary a line three leagues from its coast, and that such a reading is supported both by the State's preadmission history and by subsequent events. The Government, on the other hand, insists that the phrase includes only the islands themselves lying within three leagues of the coast, and not all waters within that distance as well.[108]

---

[107a] 2 Stat. 701, 702. The terms of this Act were practically identical with those of the Louisiana Enabling Act, passed the year before. 2 Stat. 641.

[108] In precise modern usage, the term "shore" denotes the line of low-water mark along the mainland, while the term "coast" denotes

## 1. *The Act of Admission on Its Face.*

The language of the Act itself appears clearly to support the Government's position. The boundary line is drawn down the middle of the river Iberville *"to* the gulf of Mexico," not *into* it for any distance. The State is thence to be bounded *"by the said gulf,"* not by a line located three leagues out in the Gulf, "to the place of beginning," which is described as *"at* the mouth of the river Sabine," not somewhere beyond the mouth in the Gulf. (Emphasis added.) And while "all islands" within

---

the line of the shore plus the line where inland waters meet the open sea. It is obvious that the term "coast" was used in Louisiana's Act of Admission in a nontechnical sense to denote what is actually the shore. The Acts admitting both Mississippi and Alabama contain similar provisions for the inclusion of all islands within six leagues of the *shore,* despite the fact that Great Britain had proclaimed those areas in 1763 to include all islands within six leagues of the "sea coast." And, in *Louisiana* v. *Mississippi,* 202 U. S. 1, 47, this Court held that the "coast" referred to in Louisiana's Act of Admission was the St. Bernard marshes on the mainland and not the Chandeleur Islands, which might be thought to be the seaward limit of inland waters.

The Government concedes that all the islands which are within three leagues of Louisiana's shore and therefore belong to it under the terms of its Act of Admission, happen to be so situated that the waters between them and the mainland are sufficiently enclosed to constitute inland waters. Thus, Louisiana is entitled to the lands beneath those waters quite apart from the affirmative grant of the Submerged Lands Act, under the rule of *Pollard's Lessee* v. *Hagan,* 3 How. 212. Furthermore, since the islands enclose inland waters, a line drawn around those islands and the intervening waters would constitute the "coast" of Louisiana within the definition of the Submerged Lands Act. Since that Act confirms to all States rights in submerged lands three miles 'from their coasts, the Government concedes that Louisiana would be entitled not only to the inland waters enclosed by the islands, but to an additional three miles beyond those islands as well. We do not intend, however, in passing on these motions, to settle the location of the coastline of Louisiana or that of any other State.

three leagues of the coast were to be included, there is no suggestion that all waters within three leagues were to be embraced as well. In short, the language of the Act evidently contemplated no territorial sea whatever.

Similar language was employed in the Treaty of Paris of September 3, 1783, by which Great Britain recognized the independence of the United States.[109] After describing the boundary of the United States from the mouth of the St. Croix River in the Bay of Fundy to the mouth of the St. Mary's River between Georgia and Florida, the parties added: "comprehending all islands within twenty leagues of any part of the shores of the United States . . . ." In the light of Jefferson's observation, only 10 years later, that national claims to control of the sea beyond approximately 20 miles from the coast had not theretofore been generally recognized among maritime powers;[110] his accompanying proposal that a three-mile limit should be placed upon the extent of territorial waters;[111] and subsequent American and British policy in this regard, see note 54, *supra,* it is hardly conceivable that this provision of the Treaty was intended to establish United States territorial jurisdiction over all waters lying within 20 leagues (60 miles) of the shore.[112] No reason appears for reading

---

[109] 8 Stat. 80, 82.

[110] Circular sent by Jefferson to United States Attorneys, ms. in National Archives, Record Group 59.

[111] *Ibid.;* see also letter from Jefferson to George Hammond, British Minister, Nov. 8, 1793, H. Exec. Doc. No. 324, 42d Cong., 2d Sess. 553; letter from Jefferson to Edmond Genet, French Minister, American State Papers, 1 Foreign Relations 183.

[112] While, as we have observed, Congress may fix state boundaries independently of Executive policy on the extent of territorial waters, subject to any limitations imposed by that policy, the Treaty of Paris does not present such a situation. It represents an exercise of purely Executive power (prior, in fact, to the establishment of the Federal Constitution) in setting a national boundary with another nation.

the Louisiana statute differently. The conclusion that language claiming all islands within a certain distance of the coast is not meant to claim all the marginal sea to that distance is further confirmed by the Act defining the boundaries of Georgia,[113] which claims three miles of marginal sea but all islands within 20 leagues of the coast. That Act provides:

"along the middle of [the St. Mary's] river to the Atlantic Ocean, and extending therein three English miles from low-water mark; thence running in a northeasterly direction and following the direction of the Atlantic coast to a point opposite the mouth, or inlet, of said Savannah River; and from thence to the mouth or inlet of said Savannah River, to the place of beginning; including all the lands, waters, islands, and jurisdictional rights within said limits, and also all the islands within 20 marine leagues of the seacoast."

Nothing in the case of *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, tends toward a contrary construction. The Court there held that an Act of Congress designating as an Indian reservation "the body of lands known as Annette Islands" included the intervening and surrounding waters and submerged lands, which were inland waters admittedly under the control of the United States, whether actually part of the reservation or not. The Court, construing the statute in light of the Indians' historic use of these waters as fishing grounds, merely concluded that Congress intended to include in the area reserved the waters and water bed, as well as the islands, referring to both "as a single body of lands." *Id.*, 89. The construction here contended for by Louisiana would,

---

[113] Ga. Code Ann. § 15–101, derived from Act 1788, Cobb, 150; Watkins' Dig. 713–762, as amended, Acts 1916, p. 29.

in contrast, sweep within the State's jurisdiction waters and submerged lands which bear no proximate relation to any islands, and which would otherwise be part of the high seas.

Louisiana also contends, relying on *United States* v. *Texas,* 162 U. S. 1; *Louisiana* v. *Mississippi,* 202 U. S. 1, that this Court has already determined that its boundary includes three leagues of marginal sea. The *Texas* case, however, involved only the question whether Greer County, in the northwest part of the State, was properly a part of Texas. And even if that case had effectively established a three-league maritime boundary for Texas, which quite evidently it did not, that would not establish a similar boundary for Louisiana.

The *Mississippi* case involved only the issue of the boundary between Louisiana and Mississippi. Louisiana relies on the holding of the Court that because the eastern boundary of Louisiana was a water boundary along the middle of the river Iberville, extending to the Gulf, it went on to include a deep-water sailing channel in the Gulf adjacent to Mississippi. It also relies on a rough map included in the Court's opinion showing a line drawn all the way around the State's coast at some distance in the Gulf. There is, however, no indication whatever that the line so indicated bore any relation to the three-league provision in the Louisiana Act of Admission. Furthermore, if there could be any doubt that only the portion of the water boundary adjacent to Mississippi was considered by the Court, it is dispelled by the Court's statement that

> "Questions as to the breadth of the maritime belt or the extent of the sway of the riparian States require no special consideration here. The facts render such discussion unnecessary." *Id.,* 52.

See also *United States* v. *California, supra,* at 37.

## 2. *Preadmission History.*

Preliminarily, it should be observed that in light of what has already been said, pp. 24–30, *ante,* Louisiana's preadmission history is relevant in this case only to the extent that it aids in construing the Louisiana Act of Admission. The thrust of the State's argument on this score is that the boundaries fixed by the Act of Admission comprised the entire area acquired by the United States from France through the Louisiana Purchase, effected by the Treaty of Paris in 1803; that the extent of this area traces back, through cessions by France to Spain in 1762 and Spain to France in 1800, to what was first claimed by France in 1682; and that such area originally extended some 120 miles into the Gulf of Mexico, and in any case, by virtue of other events, at least three leagues into the Gulf.

For reasons now to be discussed we think that this historical thesis is not borne out by any of the documents or events on which Louisiana relies, but that to the contrary what has been shown us leads to the conclusion that Louisiana's preadmission territory, consistently with the Act of Admission, stopped at its coast and did not embrace any marginal sea.

1. The area which includes the present State of Louisiana was first claimed for France by La Salle in 1682, extending southward

> "as far as [the Mississippi's] . . . mouth in the sea, or gulf of Mexico, about the twenty-seventh degree of the elevation of the North Pole . . . ." [114]

It is apparent from the face of La Salle's proclamation that it was the mouth of the Mississippi which defined

---

[114] ". . . jusqu'à son embouchure dans la mer ou golfe de Mexique, environ les 27 degrez d'élévation du pôle septentrional . . . ." 2 Margry, Découvertes et Établissements des Français dans L'Ouest et dans le Sud de L'Amérique Septentrionale (1877), 191–192.

the southerly limit of his claim. His expression of belief that the river mouth was at "about" the 27th parallel does not indicate an intent to claim to that parallel, which is in fact some 120 miles south of the Mississippi's mouth. In any event, the *procès-verbal* of Jacques de la Métairie, notary of the La Salle expedition,[115] shows that the proclamation was issued after the mouth of the Mississippi had been reached and the party had returned upstream only far enough to find solid ground for the erection of a monument, and that La Salle then thought, mistakenly in fact, that they were at about the 27th parallel. Other documents also indicate that the river mouth defined the extent of the claim and that the territory included no marginal sea whatever.[116]

2. By a secret Treaty executed at Fontainebleau on November 3, 1762, France ceded to Spain "all the country known under the name of Louisiana, as well as New Orleans and the island in which the place stands." [117] By the secret Treaty of San Ildefonso, signed October 1, 1800, Spain retroceded the "colony and province of Louisiana" to France.[118] Certainly there is nothing on the face of

---

[115] 2 Margry, *op. cit., supra,* at 186, 190–191.

[116] Fragment of a letter of La Salle, 2 Margry, *op cit., supra,* at 199 (the Mississippi runs as far as the 27th degree, where it discharges into the sea); Letters Patent issued on Sept. 14, 1712, by Louis XIV to his Secretary, Antoine Crozat, for exclusive trading in Louisiana, in Greenhow, Memoir, Historical and Political, on the Northwest Coast of North America, S. Doc. No. 174, 26th Cong., 1st Sess. 150 (Louisiana extends along the Mississippi "from the seacoast to the Illinois country") ; Definitive Treaty of Peace between Great Britain, Spain, and France, signed at Paris, Feb. 10, 1763, Art. VII, 15 Parliamentary History of England 1291, 1296 (domains of Britain and France separated by a line drawn along the middle of the river Iberville, and lakes Maurepas and Pontchartrain "to the sea").

[117] 13 Cong. Deb., 24th Cong., 2d Sess., pt. II, App. 226.

[118] *Id.,* at 229.

either of these Treaties to indicate that France or Spain claimed any territorial sea.

3. Louisiana argues, however, that certain treaties between France, Spain, and other nations evidence such an intent. Four of these treaties concern the right of the French to fish within certain distances of the coasts of the British possessions in North America, varying from three to 30 leagues. The relevant portions do not relate to French or Spanish territory at all.[119] In another, Great Britain undertook not to permit its subjects to navigate or fish within 10 leagues of coasts occupied by Spain "in the *Pacific Ocean*, or in the *South Seas*," so as to prevent illicit trade with Spanish settlements.[120] The Treaty does not relate to the area in question, and, far from being an assertion of a territorial claim by Spain, imposed an obligation of a limited nature on Great Britain alone. The same reasoning applies to another of these treaties, the Treaty between Spain and Tripoli, signed September 10, 1794, prohibiting the capture of any vessel within 10 leagues from coasts of the dominions of Spain.[121] Reliance is also placed on an ordinance promulgated by Philip II of Spain in October 1565, asserting rights within the visual horizon of the coasts of Spain and its possessions.[122] It may be questioned whether this ordinance

---

[119] Treaty of Utrecht, 1713, between Great Britain and France, 17 Journal of the House of Commons 329; Preliminary Treaty of Peace between Great Britain, Spain, and France, Nov. 3, 1762, 15 Parliamentary History of England 1241, 1243; Definitive Treaty of Peace between Great Britain, Spain, and France, Feb. 10, 1763, 15 Parliamentary History of England 1291, 1295; Definitive Treaty of Peace and Friendship between Britain and France, at Versailles, Sept. 3, 1783, 39 Journal of the House of Commons 718, 719.

[120] Convention between Great Britain and Spain, at The Escurial, Oct. 28, 1790, 46 Journal of the House of Commons 30.

[121] Estevan de Ferrater, Codigo de Derecho Internacional (Barcelona 1846), Vol. I, p. 488.

[122] Ernest Nys, Le Droit International, Vol. I, p. 499.

even constituted an assertion of territorial jurisdiction as it is known today, especially in view of the fact that the concept of the territorial sea did not arise in international law until after this country achieved its independence. See *United States* v. *California, supra,* 32–33. Even if it did, the ordinance can hardly be taken as applying to a territory not acquired by Spain until 200 years later or as affecting the construction of the Act admitting Louisiana to the Union 250 years later.[123]

4. By the Treaty of Paris, signed April 30, 1803, France ceded to the United States the Louisiana Territory with all its rights and appurtenances "as fully and in the same manner as they have been acquired by the French Republic, in virtue of the above-mentioned treaty [Treaty of San Ildefonso, Oct. 1, 1800], concluded with his Catholic Majesty," including "the adjacent islands belonging to Louisiana."[124] To show that the Act admitting Louisiana to the Union must be construed as referring directly to this Treaty, Louisiana relies on Article III of the Treaty, which required the United States to admit "the ceded territory" to statehood as soon as possible. But since the historic documents to which our attention has been called fail to show that the ceded territory included any territorial sea, taking the Treaty as defining the scope of the Act of Admission only confirms the view that Louisiana's maritime boundary was fixed at, and not somewhere in, the Gulf of Mexico.

---

[123] Certain correspondence between the United States and Spain involving a dispute over the eastern and western limits of Louisiana also indicates that Spain believed the territory ended at the Gulf of Mexico. Letter from Pedro Cevallos, Spanish Foreign Minister, to Charles Pinckney and James Monroe, United States Envoys, Apr. 13, 1805, American State Papers, 2 Foreign Relations 660, 662; letter from Luis de Onis, Spanish Ambassador, to John Quincy Adams, United States Secretary of State, Dec. 29, 1817, American State Papers, 4 Foreign Relations 452, 453; letter from de Onis to Adams, Mar. 23, 1818, *id.,* at 480, 484.

[124] 8 Stat. 200, 202.

5. Louisiana also asserts that about the time of its admission, the United States was claiming three leagues of territorial waters in the Gulf, and that the Act of Admission was framed with reference to that claim. However, from the great variety of documentation presented by the parties, the most that could possibly be said is that the United States, contrary to the Government's contention, had not unequivocally asserted the applicability of the three-mile limit in the Gulf of Mexico. Assuming, as the defendants have here argued, that it would have been reasonable under international law for the United States to claim three leagues of territorial waters in the Gulf had it so chosen, we nevertheless cannot conclude that Congress meant to define Louisiana's boundaries by reference to a rule which was the subject of so much difference among nations and which had never been adopted by this country. The terms of the Act of Admission seem to point so strongly to the contrary that it would require much more convincing evidence than this to persuade us that the construction advanced by Louisiana is correct. Furthermore, it is significant that only a few years later, Congress admitted Mississippi and Alabama to the Union, describing their boundaries as including all islands within six leagues of the shore. See pp. 81, 82, *post*. If the three-league provision in Louisiana's Act of Admission was intended to reflect a policy of claiming three leagues of territorial waters, it is difficult to understand why Congress, so shortly thereafter, should have incorporated a six-league limit in an otherwise identical provision.

### 3. Postadmission Events.

To the extent that Louisiana's reliance on postadmission events is for the purpose of showing that the United States established a three-league "national boundary" in the Gulf, they cannot help her case, for reasons previously discussed. *Ante,* pp. 30–36. We need not decide whether the United States ever claimed three leagues of

territorial waters along the entire Gulf coast, which could in a sense be said to constitute a national boundary, or whether, if it did, Louisiana would have been entitled to extend its own boundary to that distance. Under the Submerged Lands Act, Louisiana's boundary must be measured at the time of her admission, unless a subsequent change was approved by Congress. If the Act of Admission fixed the boundary at the shore, neither action by Congress fixing greater boundaries for other States nor Executive policy on the extent of territorial waters could constitute Congressional approval of a maritime boundary for Louisiana. Louisiana, however, insists that certain of these events subsequent to admission must be considered in construing the Act of Admission.

1. We are urged to infer that since, as the Court today holds, three-league boundaries were fixed for Texas (*ante,* p. 64) and Florida (*post,* p. 121), and since, after Texas' admission, the Treaty of Guadalupe Hidalgo fixed the starting point of the boundary between the United States and Mexico at three leagues in the Gulf, Congress must have meant to treat Louisiana equally. The inference must be based primarily on the existence of the Texas and Florida boundaries, for the Treaty of Guadalupe Hidalgo relates only to the boundary between Texas and Mexico, and tends to prove nothing more than the existence of a three-league boundary for Texas. In view of the fact that shortly after Louisiana's admission, Congress fixed maritime boundaries for Mississippi and Alabama which, even on Louisiana's construction, would be different than three leagues, we can discern no consistent Congressional policy toward the maritime boundaries of the Gulf States at the time of Louisiana's admission, even if the much later actions with respect to Texas and Florida could be thought to have established such a policy. Cf. *Louisiana* v. *Mississippi, supra,* at 41. It would require clear evidence that such a policy was operative at the time

Congress passed the Act admitting Louisiana to overcome language in that Act which points so strongly against the construction urged by Louisiana. Nor does the concept of equal footing require such a construction. While the ownership of certain lands within state boundaries has been held to be an inseparable attribute of the political sovereignty guaranteed equally to all States, see *United States* v. *Texas,* 339 U. S., at 716, the geographic extent of those boundaries, and thus of the lands owned, clearly has nothing to do with political equality. *A fortiori* this is true in the case of maritime boundaries beyond low-water mark, since, except as granted by Congress, the States do not own the lands beneath the marginal seas. See *United States* v. *California, supra; Alabama* v. *Texas, supra.*

2. Certain treaties successively entered into from 1819 to 1838 by the United States with Spain, Mexico, and the Republic of Texas establishing the boundary between Texas and the United States are relied on as indicating that the State and Federal Governments thought that Congress had fixed a three-league maritime boundary for Louisiana.[125] Louisiana contends that the treaties fixed the beginning of the international boundary at a point three leagues from land, and that therefore the southwestern corner of Louisiana as well as the southeastern corner of Texas must have been regarded as extending seaward to that distance. Whether or not such reasoning is valid, the language of the treaties refutes the premise that the international boundary began three leagues from land. Both the 1819 and the 1828 treaties recited that "[t]he boundary line between the two countries, west of

---

[125] Treaty of Amity, Settlement, and Limits (between the United States and Spain), Feb. 22, 1819, 8 Stat. 252; Treaty of Limits (between the United States and Mexico), Jan. 12, 1828, 8 Stat. 372; Convention Between the United States of America and the Republic of Texas, for marking the boundary between them, Apr. 25, 1838, 8 Stat. 511.

the Mississippi, shall begin on the Gulph of Mexico, at the mouth of the river Sabine, in the sea . . . ." The Treaty of 1838 referred to the Treaty of 1828, and provided for a survey of "that portion of the said boundary which extends from the mouth of the Sabine, where that river enters the Gulph of Mexico, to the Red river." [126]

3. In its answer to the original complaint, Louisiana alleged certain acts of sovereignty over the marginal sea and seabed and the acquiescence of the Federal Government therein.[127] Although it has now abandoned its earlier contention that these acts establish its title by prescription and estoppel apart from the Submerged Lands Act, it now urges that they indicate a subsequent practical construction of Louisiana's Act of Admission. Taking these facts as proved, they do not have the effect urged by Louisiana. They indicate only that until the 1930's, the Federal Government may have believed that lands beneath the marginal sea belonged to the States. There is no allegation that the geographical extent of Louisiana's assertions, assuming that such assertions were made beyond three miles, was drawn in question, or that the question of Louisiana's boundary was considered. Some of the acts alleged constituted police power meas-

---

[126] See note 94, *supra*.

[127] Among the acts alleged were "the passing and enforcing of laws regulating fishing, trawling and dredging of said submerged lands, the granting of leases for the cultivation, propagation and taking of oysters, fish and shrimp, for the dredging and removal of sand, gravel and shells, and for the leasing and development of said lands for oil, gas and other minerals." The answer further alleged that prior to the discovery of oil and gas under said lands, the United States had never claimed any interest in them, and that it had recognized Louisiana's title thereto when, on numerous occasions, it "requested the Chief Executive of the State to secure the passage of laws which would permit the federal government to acquire sites therein for game and fish preserves and for light houses, jetties and other aids to navigation."

ures which a State can enforce against its citizens beyond its boundaries. *Skiriotes* v. *Florida,* 313 U. S. 69. As to acts touching the development of the submerged lands themselves, the United States would have had no reason to object to activity beyond Louisiana's boundary, since not until 1945 did the Federal Government assert any rights in the Continental Shelf for itself. If any of the other acts alleged conflicted with this Nation's policy toward territorial waters, objection would have lain regardless of the location of the State's boundary, and lack of objection is therefore, for the purposes of this case, inconclusive.

4. Finally, Louisiana relies on a 1954 statute of its own establishing the State's boundary at three leagues seaward of the line between inland and open waters. Act 33 of 1954, La. Rev. Stat. 49:1. It is said that in so legislating Louisiana followed the coastline as defined in regulations promulgated by the Commandant of the Coast Guard, pursuant to the Federal Act of February 19, 1895, 28 Stat. 672, 33 U. S. C. § 151, and that because of this, and also on considerations of convenience and certainty, this state enactment should be accepted as establishing Louisiana's coast. We think the consideration of this contention should be postponed to a later stage of this case. We decide now only that Louisiana is entitled to submerged-land rights to a distance no greater than three geographical miles from its coastlines, wherever those lines may ultimately be shown to be.

## IV.

### The Particular Claims of Mississippi.

Mississippi's claim to a three-league seaward boundary must fail largely for the same reasons that have led us to reject the similar claim of Louisiana.

The territory which now comprises the part of Mississippi lying south of the 31st parallel was originally ceded by France to Great Britain by the Treaty of Paris of February 10, 1763.[128] Great Britain designated this territory part of West Florida, and by proclamation of October 7, 1763, King George III described West Florida as

> "bounded to the southward by the gulf of Mexico, including all islands within six leagues of the coast, from the river Apalachicola to Lake Pontchartrain . . . ."[129]

On September 3, 1783, Great Britain and Spain signed a treaty by which Great Britain ceded this area to Spain as part of a cession embracing all of western and eastern Florida.[130]

By the Treaty of San Ildefonso, signed October 1, 1800, Spain ceded to France "the colony and province of Louisiana." See p. 72, *ante*. In the Treaty of Paris of April 30, 1803, France ceded Louisiana to the United States to the same extent as France had acquired it by virtue of the Treaty of San Ildefonso. See p. 74, *ante*. A dispute arose between the United States and Spain as to whether, by the Treaty of San Ildefonso, Spain had conveyed to France any land east of the Mississippi River (including any part of West Florida), and therefore whether France could have subsequently passed that territory to the United States in the Treaty of Paris. On October 27, 1810, President Madison claimed the right to possession of the area,[131] and on May 14, 1812, Congress

---

[128] 15 Parliamentary History of England 1291, 1296.

[129] 2 White, New Collection of Laws, Charters and Local Ordinances of Great Britain, France and Spain (1839), 292, 293.

[130] 39 Journal of the House of Commons 722, 723.

[131] 1 Richardson, Messages and Papers of the Presidents 465.

made it part of the Mississippi Territory.[132]   On March 1, 1817, Congress authorized the creation of the State of Mississippi, specifically setting out its boundaries, in part as follows:

> "thence due south to the Gulf of Mexico, thence westwardly, *including all the islands within six leagues of the shore,* to the most eastern junction of Pearl river with Lake Borgne . . . ."[133]   (Emphasis added.)

The Mississippi Constitution, approved by the Act admitting the State to the Union on December 10, 1817,[134] contained an identical provision.   Finally, by the Treaty of February 22, 1819, Spain purported to cede East and West Florida to the United States. 8 Stat. 254. It was determined, however, in *Foster* v. *Neilson,* 2 Pet. 253, that the portion of the State of Mississippi south of the 31st parallel passed to the United States as part of the Louisiana Purchase under the Treaty of Paris in 1803, and not as part of West Florida under the Spanish Treaty of 1819.

We have already held with respect to Louisiana's claim to a three-league maritime boundary that an Act of Admission which refers to all islands within a certain distance of the shore does not appear on its face to mean to establish a boundary line that distance from the shore, including all waters and submerged lands as well as all islands.   There is nothing in Mississippi's history, just as there is nothing in Louisiana's, to cause us to depart from that conclusion in this instance.   Indeed, Mississippi relies almost entirely on the fact that the very language which defeats its contention was repeatedly used, in the 1763 Proclamation by King George III, in the Congressional Enabling Act, and in the State Constitution, and was implicitly incorporated in mesne conveyances.

---

[132] 2 Stat. 734.         [133] 3 Stat. 348.         [134] 3 Stat. 472.

Mississippi also urges that the draftsmen of the provision must have intended to include all waters and submerged lands within six leagues from shore because the waters are very shallow and the islands are constantly shifting. This argument, however, appears only to strengthen the conclusion that it was islands upon which the provision focused, and not waters where there were no islands.

We must hold that Mississippi is not entitled to rights in submerged lands lying beyond three geographical miles from its coast.[135]

## V.

### THE PARTICULAR CLAIMS OF ALABAMA.

The preadmission history of Alabama is essentially the same as that of Mississippi, the portion of the State lying south of the 31st parallel having passed by the same mesne conveyances from France to the United States. That portion was incorporated into the Mississippi Territory by the Act of May 14, 1812,[136] and became a part of the State of Alabama formed out of that territory. Its Act of Admission [137] incorporated the Enabling Act, which described its boundary in part as follows:

> "thence, due south, to the Gulf of Mexico; thence, eastwardly, including all islands within six leagues of the shore, to the Perdido river . . . ." [138]

The same reasons applicable to the claims of Louisiana and Mississippi compel us to hold that Alabama is not entitled to rights in submerged lands lying beyond three geographical miles from its coast.[139]

---

[135] We express no opinion at this time on the location of Mississippi's coastline. See note 108, ante.

[136] 2 Stat. 734.    [137] 3 Stat. 608.    [138] 3 Stat. 489, 490.

[139] We express no opinion at this time on the location of Alabama's coastline. See note 108, ante.

## VI.

### Conclusions.

On the basis of what has been said in this opinion, we reach the following conclusions:

1. As to the States of Louisiana, Mississippi, and Alabama, a decree will be entered (1) declaring that the United States is entitled, as against these States, to all the lands, minerals, and other natural resources underlying the Gulf of Mexico more than three geographical miles from the coast of each such State, that is, from the line of ordinary low-water mark and outer limit of inland waters, and extending seaward to the edge of the Continental Shelf; (2) declaring that none of these States is entitled to any interest in such lands, minerals, and resources; (3) enjoining these States from interfering with the rights of the United States therein; (4) directing each such State appropriately to account to the United States for all sums of money derived therefrom subsequent to June 5, 1950; [140] and (5) dismissing the cross bill of the State of Alabama. [141]

---

[140] On June 5, 1950, the date of this Court's decision in the *Louisiana* and *Texas* cases, all coastal States were put on notice that the United States was possessed of paramount rights in submerged lands lying seaward of their respective coasts. The Submerged Lands Act, passed in 1953, by which parts of those lands were relinquished to the States, also forgave any monetary claims arising out of the States' prior use of the lands so relinquished. But the United States remains entitled to an accounting for all sums derived since June 5, 1950, from lands not so relinquished.

Mississippi contends that it is not liable for an accounting, since it was never party to a suit decreeing the United States' rights in offshore lands. However, principles announced in the 1950 *Louisiana* and *Texas* cases are plainly applicable to all coastal States, and Mississippi was put on notice by the decrees in those cases. *A fortiori,*

2. As to the State of Texas, a decree will be entered (1) declaring that the State is entitled, as against the United States, to the lands, minerals, and other natural resources underlying the Gulf of Mexico to a distance of three leagues from Texas' coast, that is, from the line of ordinary low-water mark and outer limit of inland waters; (2) declaring that the United States is entitled, as against Texas, to no interest therein; (3) declaring that the United States is entitled, as against Texas, to all such lands, minerals, and resources lying beyond that area, and extending to the edge of the Continental Shelf; (4) enjoining the State from interfering with the rights of the United States therein; and (5) directing Texas appropriately to account to the United States for all sums of money derived since June 5, 1950, from the area to which the United States is declared to be entitled.

3. Jurisdiction over this case will be retained for such further proceedings as may be necessary to effectuate the rights adjudicated herein.

4. The motions of Louisiana and Mississippi to take depositions and present evidence are denied, without prejudice to their renewal in such further proceedings as may be had in connection with matters left open by this opinion.[142]   In so deciding we have not been unmindful of this Court's liberality in original cases of "allowing full development of the facts."   See *United States* v. *Texas,* 339 U. S. 707, 715.   We think, however, that the conclusions to be drawn from the historical documents relied on

---

the similar contention of Louisiana, the defendant in the 1950 *Louisiana* case, must be overruled.

[141] In light of these conclusions we do not reach the question whether Alabama's cross bill constitutes an "unconsented" suit against the United States.

[142] The same disposition is made of the similar averment in Alabama's answer.   Texas' motion for similar relief and for a severance is rendered moot by our decision as to it.

by Louisiana, Mississippi, and Alabama are so clear as to leave no issue presently involved open to dispute, and that we would not be justified in postponing the granting of the relief to which we find the United States entitled as against these three States.[143] By the same token we see no need to postpone the adjudication of the issues now presented as between the United States and Texas, and we do not understand the Government indeed to contend otherwise.

The parties may submit an appropriate form of decree giving effect to the conclusions reached in this opinion.

*It is so ordered.*

THE CHIEF JUSTICE and MR. JUSTICE CLARK took no part in the consideration or decision of these cases.

[For opinion of MR. JUSTICE FRANKFURTER, joined by MR. JUSTICE BRENNAN, MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART, see *post,* p. 129.]

MR. JUSTICE BLACK, concurring in part and dissenting in part.

I concur in the Court's judgment that Texas owns the belt of submerged lands extending three marine leagues from that State's coastline into the Gulf of Mexico (including oil and other resources), but dissent from denial of like claims by Louisiana, Mississippi and Alabama.

The claims of all these States depend on our interpretation and application of the Submerged Lands Act

---

[143] The alternative motion of Louisiana, contained in its answer to the original complaint herein, to transfer the case as to it to the United States District Court in Louisiana is denied for the same reasons, and on the further ground that we have already determined that the issues as to all the defendant States should be heard together in this Court. 354 U. S. 515.

passed in 1953.[1]  Two bills previously passed by Congress, substantially the same as the 1953 Act, were vetoed by the President.[2]  After the first veto we refused to hold that California, Texas and Louisiana owned or had ever owned legal title to the submerged lands adjacent to their coasts.  We held that the United States, not the States, had paramount rights in and power over such lands and their products, including oil.[3]  Congress accepted our holdings as declaring the then-existing law—that these States had never owned the offshore lands—but believed that *all* coastal States were equitably entitled to keep all the submerged lands they had long treated as their own,[4] without regard to technical legal ownership or boundaries.  Accordingly, Congress exercised its power by passing the Submerged Lands Act in an attempt to restore the "rights and powers of the States and those holding under [them] . . . as they existed prior to the

---

[1] 67 Stat. 29, 43 U. S. C. §§ 1301–1315.

[2] H. J. Res. 225, 79th Cong., 2d Sess., 92 Cong. Rec. 10660; S. J. Res. 20, 82d Cong., 2d Sess., 98 Cong. Rec. 6251.

[3] *United States* v. *Texas*, 339 U. S. 707; *United States* v. *Louisiana*, 339 U. S. 699; *United States* v. *California*, 332 U. S. 19.

[4] "Therefore, in full acceptance of what the Supreme Court has now found the law to be, Congress may nevertheless enact such legislation as in its wisdom it deems advisable to solve the problems arising out of the decision." S. Rep. No. 133, 83d Cong., 1st Sess. 56, from the reprint, in Appendix E, of S. Rep. No. 1592, 80th Cong., 2d Sess.

"Mr. DANIEL. . . . We can and do accept the decisions of the Court as the interpretation of the law as it exists today, but, by the same token, the Congress of the United States, in placing its interpretation on the Constitution and in deciding the equities can write the law for the future differently from that which the Court has found it to be at this time.

"That is what we propose in Senate Joint Resolution 13. We want Congress to write the law for the future exactly as it was understood and believed to be during the first 150 years of the existence of this Nation." 99 Cong. Rec. 4080–4081.

decision of the Supreme Court of the United States in the California case." [5]

To accomplish this purpose the Act first provides for an outright grant to *all* the coastal States of a boundary three geographical miles from their coastlines.[6] The Gulf States, however, were not satisfied with three *miles* but claimed that special circumstances entitled them to three *leagues* (about 10½ miles) or more. They urged, among other things, that claims of the Gulf States and their predecessors in title had always been more expansive than claims of coastal States in other parts of the country; that when admitted to the Union their constitutions contained definitions which, properly interpreted, described

---

[5] "Finally, it is the intent and purpose of this bill to establish the law for the future so that the rights and powers of the States and those holding under State authority may be preserved as they existed prior to the decision of the Supreme Court of the United States in the California case." S. Rep. No. 133, 83d Cong., 1st Sess. 75. This is the closing paragraph of S. Rep. No. 1592, 80th Cong., 2d Sess., printed as an Appendix to the Report on the 1953 Act. See also S. Rep. No. 133, 83d Cong., 1st Sess. 6: "The offshore rights which are confirmed to the States and their grantees are rights growing out of the concept of ownership and proprietary use and development—rights which were first asserted by the Federal Government in recent years and which it has never exercised nor enjoyed. These rights, legally vested in the States and their grantees by Senate Joint Resolution 13, have in fact been enjoyed and exercised by them from the beginning of our history as a nation until the date of the California decision." And see Hearings before the Senate Interior and Insular Affairs Committee on S. J. Res. 13, etc., 83d Cong., 1st Sess. 32.

[6] "It is . . . declared to be in the public interest that . . . title to . . . the lands beneath navigable waters within the boundaries of the respective States . . . be . . . vested in and assigned to the respective States . . . ." 43 U. S. C. § 1311 (a). "The term 'lands beneath navigable waters' means . . . (2) all lands . . . seaward to a line three geographical miles distant from the coast line of each such State . . . ." § 1301 (a).

88

boundaries extending three to six leagues seaward; that the Gulf States had not only claimed these more expansive boundaries, but had always exercised possessory and ownership rights over these marginal lands and their products at will without regard to any three-mile limitations; and that historically the United States had never questioned any of their claims until disputes arose regarding oil leases during the late 1930's.[7] Moved by these

[7] "Moreover, at the time Louisiana and Texas extended their seaward boundaries to 27 marine miles, the United States was not claiming ownership or jurisdiction and control over the Continental Shelf. Actually, some years earlier the State Department had taken the position that the United States had no jurisdiction over the ocean bottom of the Gulf of Mexico beyond the territorial waters adjacent to the coast and that therefore it was not in a position to grant a lease on this area. . . .

"Furthermore, the United States did not dispute the actions taken by the two States." H. R. Rep. No. 215, 83d Cong., 1st Sess. 25–26. And see note 18, *infra*.

See, *e. g.*, as to Louisiana, the statement of Miss Lucille May Grace, Register, State Land Office, State of Louisiana:

"[I]t strikes me as being highly incongruous that the Department of the Interior of the Federal Government, at this late date, should assert the slightest claim to such lands for it was in 1908 and again in 1915 that the General Land Office of the Department of the Interior wrote to the Federal land office of Louisiana, said records now being a part of the records of my office, explaining that certain lands beneath tidewaters belonged to Louisiana by her right of sovereignty, and that the State of Louisiana had made a mistake in applying 'to select such lands under the Swamp Lands Act.' . . .

"Let me respectfully request and urge your favorable consideration of this resolution in order that my State and all States, as well as the business interests of our country, who have in the past spent such high sums of money and who plan to invest greater sums in the future in the oil and gas development of our natural resources, will feel assured that our claims to such areas are recognized by all persons— once and for all—claims that we have considered sacred and valid in my State since Louisiana was admitted to the Union in 1812." Joint Hearings before House Committee on Judiciary, Senate Special Judiciary Subcommittee on H. J. Res. 118, etc., 79th Cong., 1st Sess. 82–83.

arguments, strongly supported by evidence and conces-
sions, Congress did not limit its grant to the Gulf States
to three miles of submerged lands, but granted a belt
extending all the way to each State's *"boundaries . . .* as
they existed at the time such State became a member of
the Union . . . but in no event . . . more than . . .
three marine leagues into the Gulf of Mexico. . . ." 43
U. S. C. § 1301 (b). We have upheld the power of Con-
gress to convey these marginal lands to the States.
*Alabama* v. *Texas,* 347 U. S. 272.

The statute neither defines the kind of "boundary"
which is to measure Congress' grants to these States, nor
particularizes the criteria for deciding it. We may agree
with the Government that the term "boundary" was used
here in its usual sense to mean the limit of territory, which,
in the case of a coastal boundary, would mean the outer
limit of the territorial sea. But this does not get us very
far in determining the location of these States' bound-
aries. For a number of reasons I cannot accept the Gov-
ernment's contention that each State must show a "legal"
or "legally accepted" boundary as of the date it became
a member of the Union. I cannot see how we can be
expected retroactively to reconstruct a technically defined
legal boundary, extending out into the lands under the
Gulf, if the States never technically owned any of these
lands. In *United States* v. *California,* 332 U. S. 19, and
the cases which followed it, this Court held that the States
of California, Texas and Louisiana did not own or have
title to the offshore lands they claimed. If we were now
to hold that these States must prove technical title as of
the early 1800's in order to satisfy the Submerged Lands
Act and that they have succeeded in doing so, we would
in effect be overruling our prior cases, cases expressly
accepted by Congress as declaring the law when the 1953
Act was passed. I cannot believe that Congress intended
us to try to use again the same "legal" test of ownership

we had applied in holding that the States did not own any part of their marginal lands, particularly since Congress passed the 1953 Act to allow the States' rights to be determined under established equitable, not strictly legal, principles. The opinion of Mr. Justice Douglas forcefully points out the difficulty, if not the impossibility, of finding that any of these States ever had a technical legal boundary out in the ocean. Even if a technical determination of boundaries were intended by Congress, rather than attempt that impossible task, I would prefer to return the Act to Congress for a more precise expression of its will. Cf. *United States* v. *Alcea Band of Tillamooks,* 329 U. S. 40, 54 (concurring opinion); *Northwestern Bands of Shoshone Indians* v. *United States,* 324 U. S. 335, 354–358 (concurring opinion).

Moreover, the Submerged Lands Act prescribes no standards for determining a strictly "legal" boundary according to the conveyancer's art. There are, of course, no markers out in the Gulf of Mexico to show where the boundaries were when the States were admitted. Since some were admitted anywhere from 140 to 150 years ago there are no living witnesses to testify where their boundaries were at that time. But despite these difficulties, it is our duty to give effect to the congressional act as best we can. It is therefore my view that since we cannot look to legalistic tests of title, we must look to the claims, understandings, expectations and uses of the States throughout their history. This is because of the congressional expressions, stated time and time again that the Act's purpose was to restore to the States what Congress deemed to have been their historical rights and powers. Nor can I accept the Government's argument that these States' interests in the marginal seas must be determined in accord with the national policy of foreign relations. Everything in the very extended congressional hearings and reports refutes any such idea. Instead,

these sources indicate that Congress passed the Act to apply broad principles of equity—not as we see it but as Congress saw it.[8]   In determining the boundaries of these States, we must, I think, recognize and follow the same principles if we are to effectuate the congressional purpose that produced this Act.   That is what I would do. A few references to the legislative background will illustrate the guides Congress intended we should apply in interpreting its Act.

Senator Ellender of Louisiana invoked the equitable sense of Congress.[9]  Senator Holland of Florida, the author of the bill, urged Congress to "look into the equi-

___

[8] Under the heading, "Equity best served by establishing State ownership," the earlier Senate Report incorporated in the Report on the 1953 Act summarizes the equitable features involved:

"The repeated assertions by our highest Court for a period of more than a century of the doctrine of State ownership of all navigable waters, whether inland or not, and the universal belief that such was the settled law, have for all practical purposes established a principle which the committee believes should as a matter of policy be recognized and confirmed by Congress as a rule of property law.

"The evidence shows that the States have in good faith always treated these lands as their property in their sovereign capacities; that the States and their grantees have invested large sums of money in such lands; that the States have received, and anticipate receiving large income from the use thereof, and from taxes thereon; that the bonded indebtedness, school funds, and tax structures of several States are largely dependent upon State ownership of these lands; and that the legislative, executive, and judicial branches of the Federal Government have always considered and acted upon the belief that these lands were the properties of the sovereign States.

"If these same facts were involved in a dispute between private individuals, an equitable title to the lands would result in favor of the person in possession. . . ." S. Rep. No. 133, 83d Cong., 1st Sess. 67, reprinting S. Rep. No. 1592, 80th Cong., 2d Sess.

To the same effect is the conclusion of the 1953 Report: "By this joint resolution the Federal Government is itself doing the equity it expects of its citizens." *Id.*, at 24.

[9] 99 Cong. Rec. 4393–4394.

92

ties and the moral considerations that are involved. . . ." [10]
The presiding officer of the Senate Committee, who con-
ducted the hearings and reported the bill, told the Con-
gress that "justice, equity, and the best interests of the
Nation will be served by the enactment of this legisla-
tion." [11] The Senate Committee Report on an earlier bill,
printed and adopted as a part of the Report on the 1953
Act, declared that "The Congress, in the exercise of its
policy powers, is not and should not be confined to the
same technical rules that bind the courts in their deter-
mination of legal rights of litigants. . . . The com-
mittee believes that, as a matter of policy in this instance,
the same equitable principles and high standards that
apply between individuals, should be applied by Congress
as between the National Government and the sovereign
states." [12] The very last paragraph of the report on the
bill referred to it as "an act of simple justice to each of
the 48 States in that it reestablishes in them as a matter
of law that possession and control of the lands beneath
navigable waters inside their boundaries which have
existed in fact since the beginning of our Nation. It is
not a gift; it is a restitution." [13]

Congress has thus repeatedly emphasized its desire to
have the States' rights in these submerged lands deter-
mined not under "technical rules" but, as the Senate Com-
mittee said, in accordance with "equitable principles and
high standards" of justice.[14] To point out specifically

---

[10] Hearings before the Senate Committee on Interior and Insular
Affairs on S. J. Res. 13, etc., 83d Cong., 1st Sess. 69.

[11] 99 Cong. Rec. 4382.

[12] S. Rep. No. 133, 83d Cong., 1st Sess. 68, 67. And see statement
of Senator Daniel in the Hearings before the Senate Interior and
Insular Affairs Committee on S. J. Res. 13, etc., 83d Cong., 1st Sess.
695.

[13] Id., at 24.

[14] Text accompanying note 12, supra.

what it meant, that Committee referred to three similar cases of this Court. One, which is illustrative, was *Indiana* v. *Kentucky,* 136 U. S. 479.[15]  That case involved a boundary dispute between Indiana and Kentucky. The crucial question was the determination in 1890 of the location of the Kentucky boundary when Kentucky became a State in 1792. That same kind of backward-looking determination of boundaries is involved here with reference to the Gulf States. In the *Indiana-Kentucky* case, as here, there were no satisfactory markers, and testimony of living witnesses was deemed to be of little value. There was much evidence in the *Indiana-Kentucky* case, however, that Kentucky had exercised authority over the disputed territory since it first became a State and that Indiana had never challenged the boundary or the authority of Kentucky. Emphasizing the great value of that evidence this Court said: "This long acquiescence in the exercise by Kentucky of dominion and jurisdiction over the island is more potential than the recollection of all the witnesses produced on either side. . . . It is a principle of public law universally recognized, that long acquiescence in the possession of territory and in the exercise of dominion and sovereignty over it, is conclusive of the nation's title and rightful authority." 136 U. S., at 510. The Court went on to quote the following from *Rhode Island* v. *Massachusetts,* 4 How. 591, 639, "For the security of rights, whether of States or individuals, long possession under a claim of title is protected. And there is no controversy in which this great principle may be invoked with greater justice and propriety than in a case of disputed boundary." 136 U. S., at 511.

---

[15] The other two cases were *United States* v. *Texas,* 162 U. S. 1, and *New Mexico* v. *Texas,* 275 U. S. 279. S. Rep. No. 133, *supra,* at 67.

Accepting, as I think we should, the desire of Congress to have the ancient boundaries of these Gulf States determined on the basis of their long-unchallenged claims, rather than by the use of subtle and refined legal inferences, I am led to the conclusion that the other Gulf States, as well as Texas, are entitled to prevail over the Government here. It is admitted that prior to 1937 the United States never claimed any title to, or exercised any possession over, any part of these marginal lands, either within or without three-mile limits, except under grants from the States. On the other hand, each of the Gulf States began to exercise acts of possession, ownership, dominion and sovereignty over the marginal belt from the time of admission into the Union, without regard to any three-mile limit.[16] The hearings of Congressional Committees show and their reports assert that very large sums of money have been spent by the States and their public agencies and grantees in the development and improvement of the marginal submerged lands adjacent to the States' borders.[17] Not only have the States' posses-

---

[16] See note 5, *supra*.

[17] "States and their grantees have expended millions of dollars to build piers, breakwaters, jetties, and other structures, to install sewage-disposal systems and to fill in beaches and reclaim lands. During the past two decades California, Louisiana, and Texas have been leasing substantial portions of the lands in question for oil, gas, and mineral development. California commenced such leasing in 1921 and Texas in 1926. Other States, including Washington, Florida, Mississippi, North Carolina, and Maryland, have made leases for like purposes. States have levied and collected taxes upon interests in and improvements on these lands. It appears to the committee that the States have exercised every sovereign right incident to the utilization of these submerged coastal lands." S. Rep. No. 133, 83d Cong., 1st Sess. 64, from S. Rep. No. 1592, 80th Cong., 2d Sess. Senator Holland placed the figure at "billions of dollars of invested money." Hearings before the Senate Interior and Insular Affairs Committee on S. J. Res. 13, etc., 83d Cong., 1st Sess. 74.

sion, dominion and sovereignty over these marginal belts been open and notorious, but that is coupled with the fact that for much more than a century federal departments and agencies not only acquiesced in but unequivocally recognized the States' rightful claims to these belts.[18]   It is conceded that in many instances the Government itself has deemed it necessary to acquire title from these States before attempting to exercise any power of its own.[19] There is nothing to indicate that the claims or uses of the marginal lands were ever limited to three miles.   Certainly there is no evidence before us, and there was none before the Congress, that up to 1937 the United States had ever attempted to limit the sovereignty of the Gulf States within boundaries three miles from their coasts. On the other hand, evidence considered by the Congressional Committees and argued to us provides ample support for holding that the Gulf States did not consider their boundaries as limited to three miles.

---

[18] President Truman, in his veto message of S. J. Res. 20, 82d Cong., 2d Sess., acknowledged that, "Even so careful and zealous a guardian of the public interest as the late Secretary of the Interior, Harold Ickes, at first assumed that the undersea lands were owned by the States." H. R. Rep. No. 215, 83d Cong., 1st Sess. 104. And the Senate Report noted that "The facts are conclusive that at least prior to 1937 the policy of the executive departments of the Government has consistently been to recognize State ownership of the submerged lands, whether inland or not, within the territorial jurisdiction of the State." S. Rep. No. 133, 83d Cong., 1st Sess. 65, from S. Rep. No. 1592, 80th Cong., 2d Sess. A letter to this effect written by Secretary Ickes in 1933 was read at the Hearings before the Senate Interior and Insular Affairs Committee on S. J. Res. 13, etc., 83d Cong., 1st Sess. 68. And see note 7, supra, and accompanying text.

[19] Senator Holland mentioned an incomplete list prepared by California of 195 such instances involving all coastal States, and he discussed two specific grants from Florida to the Federal Government. Hearings before the Senate Interior and Insular Affairs Committee on S. J. Res. 13, etc., 83d Cong., 1st Sess. 63–64, 65, 66, and see Senator Daniel's statement at 233.

The constitutions of all these States defined their boundaries when they were admitted into the Union. The first Texas Constitution kept in force the same boundary, three leagues into the Gulf, claimed for the Republic of Texas before it became a State.[20] This definition was presented to Congress as a reason why Texas should be granted three leagues. The constitutions of all of the other States involved here defined their coastal boundaries as extending from one Gulf point to another "including all islands" three or six leagues from the shore or coastline. The legislative history of the Submerged Lands Act shows that these definitions were repeatedly called to the attention of Congress as a reason why these Gulf States should be granted three leagues or more.[21] From the standpoint of the paper boundary

---

[20] Texas Const., 1845, Art. XIII, § 3, continued in effect "All laws . . . in force in the Republic of Texas," thus including the 1836 Boundary Act. Republic of Texas Boundary Act, December 19, 1836, 1 Laws of the Republic of Texas 133 (3 leagues).

[21] These provisions are found in Ala. Const., 1819, preamble (6 leagues); Miss. Const., 1817, preamble (6 leagues); La. Const., 1812, preamble (3 leagues).

From the beginning of the congressional hearings on the matter of the submerged lands, it has been clear to Congress that all the Gulf States' constitutional definitions of their boundaries have been a basis of their claims, without regard to the slight differences in language. These claims reappeared throughout the hearings. For illustration, an eight-page opinion of Dean Borchard of Yale appeared as "Appendix B" to S. Rep. No. 1260, 79th Cong., 2d Sess., as early as 1946. He stated: "Examining the conduct of the States we find a series of provisions in State constitutions and statutes in which several States, e. g., Alabama, Florida, Georgia, Mississippi, Texas, and Louisiana, lay claim to a maritime boundary of 3 leagues, 6 leagues, or more." Id., at 16.

During the 1953 hearings Senator Long of Louisiana was concerned by statements made by Senator Holland of Florida, the author of the bill, to the effect that only Florida and Texas would be entitled to three leagues.

"Senator Long. May I ask the Senator a question concerning my

claims, Texas urges, on the basis of the more precise definition of its seaward boundary, that it has a stronger case than the other States. Although all these paper claims were considered by Congress, none was treated as decisive of the question of state boundaries, as is clearly shown by Congress' refusal to make Texas and Florida [22] the exclusive beneficiaries of this Act simply because their constitutions had specifically defined a three-league seaward boundary. Nevertheless, each constitutional definition provides some color of title for each State's claim of a boundary extending at least three leagues from its coastline. The paper claims of each State, therefore, merely add some weight to the overwhelming fact, as Congress saw it, that for more than 100 years all the Gulf States exercised the only possession, dominion and sovereignty over the submerged lands adjacent to their coastlines that was ever exercised at all. The admitted facts with reference to these state boundaries thus entitle all the States to three-league marginal belts, if we fairly apply the equitable principles of prescription under which Congress declared this controversy between the Federal Government and the Gulf States should be settled.[23]

---

State? When Louisiana came into the Union, it is my recollection that the enabling act which was passed by Congress described the boundaries of Louisiana as including all islands within 3 leagues of the coast. . . ."

To this Senator Holland replied, "The Senator from Florida has read and studied to some extent the question which the Senator from Louisiana has mentioned. The Senator from Florida thinks that the coast of Louisiana is that rim of islands, but the court might not so find when it went before the court." Hearings before the Senate Interior and Insular Affairs Committee, 83d Cong., 1st Sess. 48.

[22] By another opinion, handed down this day, we have held that Florida is entitled to a three-league marginal belt because Congress in 1868 expressly approved the Florida Constitution which precisely defined a three-league seaward boundary. *United States* v. *Florida, post,* p. 121.

[23] See text accompanying notes 12 and 15, *supra.*

The result of the Court's holding in this and the *Florida* case[24] is that Texas and Florida will have marginal belts that uniformly extend three leagues from their shores. The other Gulf States, however, are not so fortunate. Their boundaries will extend only three miles in some places. The Government concedes, however, that their boundaries extend three miles beyond the coastline of their islands—which may be as far as six leagues from the mainland. Thus, Louisiana, Mississippi and Alabama will have irregular saw-toothed boundaries projecting six leagues at some points and retreating to within three miles of the mainland at other points. This condition follows from the Government's concession that all lands between the States' islands and the mainland are lands beneath inland waters. The mere exercise of jurisdiction over such jagged boundaries as these raises serious problems. Moreover, there is an element of fundamental unfairness about granting Texas and Florida ownership and sovereignty over three-league marginal belts while denying it to their sister States bordering the Gulf of Mexico. This is bound to frustrate the intent of Congress to settle this whole Gulf States controversy at this time.

The unfairness of the Court's result is particularly emphasized when we consider the plight in which it leaves Louisiana. One of the grounds that Congress assigned for its desire to restore these lands to the States was its strong belief that the States rather than the Federal Government should exploit their offshore oil. This desire rested on two conclusions: (1) that the States would do it better and more effectively for the interests of the public at large,[25] and (2) that it would be unconscionable

---

[24] See note 22, *supra*.

[25] "The committee believes that failure to continue existing State control will result in delaying for an indefinite time the intensive development now under way on these lands and that any delay is, in the words of Secretary Forrestal, 'contrary to the best interest of the

to take this oil away from the States after they had been solely responsible for bringing it into the public use.[26] The record shows that Louisiana had leased land out more than three leagues from its coastline as early as 1920.[27] There are still oil wells out there. For many years royalties from those wells have gone into the public treasury of the State of Louisiana. This income has become a part of the very life of the State.[28] It constitutes a large part

United States from the viewpoint of national security.' . . . Local controls and promptness of action are highly desirable. The fixed, inflexible rules and the delays and remoteness which are inseparable from a centralized national control would, in the committee's judgment, be improvident." S. Rep. No. 133, 83d Cong., 1st Sess. 70, 71, from S. Rep. No. 1592, 80th Cong., 2d Sess.

[26] "Therefore, the committee concludes that in order to avoid injustices to the sovereign States and their grantees, legislative equity can best be done by the enactment of S. 1988." *Id.*, at 68. And see notes 8–19, *supra.*

[27] See discussion in Hearings before the Senate Interior and Insular Affairs Committee on S. J. Res. 13, etc., 83d Cong., 1st Sess. 341, and Joint Hearings before House Committee on Judiciary, Senate Special Judiciary Subcommittee on H. J. Res. 118, etc., 79th Cong., 1st Sess. 82.

[28] See note 7, *supra,* for the statement of the Louisiana Registrar in 1945. She also said:

"For the fiscal year of 1944 my report shows that I have collected five and a half millions of dollars from this source. In fact the most productive area in the entire State is that in the maritime belt, or from lands beneath the tidewaters. . . .

"I would think that you gentlemen will readily understand what revenues of this size mean to the financial structure of Louisiana. . . . Terrebonne Parish, which is situated on the coast of Louisiana, received in 1944 $45,500 from the oil and gas production. Said funds are expended by the police jury for the benefit of the parish. It should certainly be obvious what this loss of revenue would mean to the taxpayers not only of this one parish but of the entire State." Joint Hearings before House Committee on Judiciary, Senate Special Judiciary Subcommittee on H. J. Res. 118, etc., 79th Cong., 1st Sess. 82.

See note 8, *supra,* for the listing by Congress of these factors as

of the support of the State's public-school system. To take these marginal lands away from the State of Louisiana and give Texas the lands it claims—when Texas apparently has no wells at all beyond the three-mile limit—seems to me completely incompatible with the kind of justice and fairness that the Congress wanted to bring about by this Act. Moreover, I am not at all sure but that this result will completely upset the congressional desire to bring about once and for all a settlement of this long-standing controversy by passage of the Submerged Lands Act.[29]

Nothing in the Act itself indicates that Texas was to be given any more consideration in this case than Louisiana, Mississippi and Alabama. Had Congress wanted to give the land to Texas and refuse to give it to the other States it easily could have done so. In fact, this was specifically suggested to Congress by the Attorney General of the United States, and the Congress rejected it.[30] Time and again Congress emphasized that its interests were focused on the problem of these lands because of the unfairness it saw in taking them from the Gulf States.

As Congress indicated, it is time that the problem be solved, the title be quieted and the controversy be stilled.[31]

---

going to the equity of the States' ownership (e. g., "that the bonded indebtedness, school funds, and tax structures of several States are largely dependent upon State ownership of these lands . . . ." S. Rep. No. 133, 83d Cong., 1st Sess. 67).

[29] See note 31, infra.

[30] "In order that there may be no misunderstanding, generally speaking what we have in mind is the 3-mile line, except for the coasts of Texas and the west coast of Florida, where 3 leagues would generally prevail." Hearings before the Senate Committee on Interior and Insular Affairs on S. J. Res. 13, etc., 83d Cong., 1st Sess. 957. And see 926, 931–933, 957–958, and Senator Jackson's comments, at 279–281.

[31] "The committee deems it imperative that Congress take action at the earliest possible date to clarify the endless confusion and multi-

In my judgment to interpret this Act in a way which grants the land to Texas and Florida and withholds it from the other Gulf States simply prolongs this costly and disquieting controversy. It will not be finally settled until it is settled the way Congress believes is right, and I do not think Congress will believe it right to award these marginal lands to Texas and Florida and deny them to the other Gulf States.

MR. JUSTICE DOUGLAS, dissenting in part.

Texas was admitted to the Union in 1845 (9 Stat. 108) pursuant to a prior Joint Resolution (5 Stat. 797) which reserved for adjustment by the United States "all questions of boundary that may arise with other governments." Texas as early as 1836 had claimed, as the opinion of the Court shows, a seaward boundary of "three leagues from land." Such a claim conflicted with our national policy in the Gulf, since the United States before then had in treaties with Spain (8 Stat. 252) and with Mexico (8 Stat. 372) described the boundaries between the two countries west of the Mississippi as commencing "on the Gulf of Mexico, at the mouth of the river Sabine, in the sea." Moreover the Convention of 1838 to establish the boundary between the United States and Texas (8 Stat. 511) agreed to the running and marking of "that portion of the said boundary which extends from

tude of problems resulting from the California decision, and thereby bring to a speedy termination this whole controversy. Otherwise inequities, injustices, vexatious and interminable litigation, and the retardment of the much-needed development of the resources in these lands will inevitably result. . . . We are certain that until the Congress enacts a law consonant with what the States and the Supreme Court believed for more than a century was the law, confusion and uncertainty will continue to exist, titles will remain clouded, and years of vexations and complicated litigation will result." S. Rep. No. 133, 83d Cong., 1st Sess. 57, 61, from S. Rep. No. 1592, 80th Cong., 2d Sess.

the mouth of the Sabine, where that river enters the Gulph of Mexico, to the Red River." Certainly in that Convention Texas was not going so far as to claim, as she had earlier, "three leagues" into the Gulf.

I agree with the Court that there was nothing done at or subsequent to that time to approve the Texas claim to three leagues from land unless it be the Treaty of Guadalupe Hidalgo signed on February 2, 1848, 9 Stat. 922, by the United States and Mexico and which, *inter alia*, fixed the "boundary line between the two republics" in the Gulf of Mexico "three leagues from land, opposite the mouth of the Rio Grande." Can we say that the United States sat at that conference table negotiating for Texas and her boundary claim? Was the seaward boundary once claimed by Texas now claimed by the United States in recognition that Texas owned it?

There is not a word in the history of the negotiations to indicate that the United States had moral or legal claim to the three-league belt because of the earlier claim of Texas. There is no suggestion that the United States claimed derivatively from the right of Texas and thus upheld the position of Texas, approving the claim made by Texas in 1836. There is not a word indicating that the Treaty of 1848 was in form or in essence an undertaking by Congress to fix the boundaries of Texas under the 1838 Convention.

The terms of the 1838 Convention do not support any such construction for, as I have said, that Convention fixed the boundary as extending "from the mouth of the Sabine, where that river enters the Gulph of Mexico," not "three leagues" seaward of that point. To conclude, therefore, that the Treaty of Guadalupe Hidalgo was intended to fix the land and sea boundaries of Texas in accordance with the Texas Boundary Act of 1836 is to indulge in mental gymnastics beyond my capacities. The agreement by the United States to fix the bound-

aries of Texas was not contained in the unilateral act of Texas reflected in her 1836 statute but by the Convention of 1838 which required the seaward boundary to extend from "the mouth of the Sabine, where that river enters the Gulph of Mexico." The obligation in this Convention thus is at war with any inference that the seaward boundary was to be "three leagues" from shore. Cf. *United States* v. *Texas,* 162 U. S. 1, 32.

While the 1838 Convention failed to include any seaward territory, a Joint Commission appointed to make the survey pursuant to the 1838 Convention actually marked the boundary between the United States and the Republic of Texas at the mouth of the Sabine River—not three leagues into the Gulf of Mexico.[1]

It is true that the Joint Resolution of 1845 (5 Stat. 797) called for the formation of Texas "subject to the adjustment by this government of all questions of boundary that may arise with other governments." But the situation envisaged by that clause soon changed. The Mexican war broke out in 1846; and the Treaty of Guadalupe Hidalgo finally brought it to a close. By the time the treaty negotiations started the United States was thinking in new dimensions. The problem was no longer finding and establishing what the Texas boundaries had been. We then put that question to one side. The instructions to

---

[1] The Journal of the Joint Commission under date of May 21, 1840, states:

". . . we proceeded to the entrance of the Sabine river into the Gulf of Mexico, and then, in virtue of our respective powers, and in conformity to the provisions of the convention between the two countries concluded at Washington the 25th day of April, 1838, we established the point of beginning of the boundary between the United States and the republic of Texas at a mound on the western bank of the junction of the river Sabine with the sea. . . . The mound was made by throwing up earth in a circular form of fifty feet in diameter, and about seven feet high at its centre. . . ." S. Doc. No. 199, 27th Cong., 2d Sess. 59.

our representative, Nicholas P. Trist, which included a projet of the Treaty, read in part, "The extension of our boundaries over New Mexico and Upper California, for a sum not exceeding twenty millions of dollars, is to be considered a *sine qua non* of any treaty. You may modify, change, or omit the other terms of the projet if needful, but not so as to interfere with this ultimatum."[2] If Lower California was included, Trist was authorized to pay up to $25,000,000.[3] Trist recorded at his first conference with the Mexican Commissioners that "our claim for extension of territory" was placed "on the ground of *indemnity* for the expenses of the war."[4] The acquisition of territory from Mexico as indemnity was repeated over and again by President Polk in his message of December 7, 1847.[5] Thus he said, ". . . if no Mexican territory was acquired, no indemnity could be obtained."[6] Again, "[t]he doctrine of no territory is the doctrine of no indemnity."[7] And what he went on to say should remove any doubts about the nature of the controversy with Mexico. First, it will be apparent from what follows that "three leagues" were not a part of his thinking when it came to the seaward boundary. Second, it is obvious that

[2] S. Exec. Doc. No. 52, 30th Cong., 1st Sess. 83.

[3] *Id.*, at 82.

[4] His first conference on January 2, 1848, was described in his own words as follows:

"President's message referred to by the Mexican Commissioners as founding our claim for extension of territory on the ground of *indemnity* for the expenses of the war. The causes of the war, & the question of *justice* in respect thereto, viewed by Mexico in a totally different light from that in which they are presented in the message. They propose *arbitration* as the first mode of settling this question and of determining the measure of indemnity justly due to the U. States. . . ." Papers of Nicholas P. Trist (Library Cong. 1917), Vol. 27, fol. 61009.

[5] H. R. Exec. Doc. No. 8, 30th Cong., 1st Sess. 3.

[6] *Id.*, at 8.

[7] *Ibid.*

the sole preoccupation was with the acquisition of land from Mexico.[8]

> "The commissioner of the United States was authorized to agree to the establishment of the Rio Grande as the boundary, *from its entrance into the Gulf* to its intersection with the southern boundary of New Mexico, in north latitude about thirty-two degrees, and to obtain a cession to the United States of the provinces of New Mexico and the Californias, and the privilege of the right of way across the isthmus of Tehuantepec. The boundary of the Rio Grande, and the cession to the United States of New Mexico and Upper California, constituted an ultimatum which our commissioner was, under no circumstances, to yield.
>
> "That it might be manifest not only to Mexico, but to all other nations, that the United States were not disposed to take advantage of a feeble power, by insisting upon wresting from her all the other provinces, including many of her principal towns and cities, which we had conquered and held in our military occupation, but were willing to conclude a treaty in a spirit of liberality, our commissioner was authorized to stipulate for the restoration to Mexico of all our other conquests.
>
> "As the territory to be acquired by the boundary proposed might be estimated to be of greater value than a fair equivalent for our just demands, our commissioner was authorized to stipulate for the payment of such additional pecuniary consideration as was deemed reasonable." (Italics added.)

And when the Treaty had been ratified by both countries and President Polk reported to Congress, he did not speak of settlement of any boundaries of the former State

---

[8] *Id.*, at 8–9.

of Texas. He stated, "The extensive and valuable terri-
tories ceded by Mexico to the United States constitute
indemnity for the past." [9] And he expounded on the
valued additions of New Mexico and Upper California
to our domain.[10] There is no mention of any settle-
ment of any claim of Texas to a seaward boundary "three
leagues" off shore. Nor is there any reference to any
boundary settlement based on old Texas claims. This is
not surprising, for the Treaty of Guadalupe Hidalgo was
part of our empire building, not the determination of old
boundaries.

The Treaty of Guadalupe Hidalgo has until now never
been considered to have played any part in determining
any Texan boundary question. As stated by the Court
in *United States* v. *Texas*, 162 U. S. 1, the boundary ques-
tion was resolved by the Act of September 9, 1850 (9 Stat.
446). After quoting the 1836 Act by which Texas claimed
"three leagues from land" as her seaward border, the
Court went on to say:

> "This boundary had not been defined when Texas
> was admitted as a State into the Union, with the
> territory 'properly included within and rightfully
> belonging to the Republic of Texas.' The settlement
> of that question, together with certain claims made
> by Texas against the United States, were among the
> subjects that engaged the attention of Congress
> during the consideration of the various measures con-
> stituting the Compromises of 1850. The result was
> the passage of the above act of September 9, 1850,
> c. 49, the provisions of which were promptly accepted
> by the State of Texas. This legislation of the two
> governments constituted a convention or contract in

---

[9] President's Message to Congress, July 6, 1848, S. Exec. Doc.
No. 60, 30th Cong., 1st Sess. 1.

[10] *Id.*, at 2.

respect of all matters embraced by it. The settlement of 1850 fixed the boundary of Texas 'on the north' to commence at the point at which *the 100th meridian* intersects the parallel of 36° 30′ north latitude, and from that point the northern line ran due west to the 103d meridian, thence due south to the 32d degree of north latitude, thence on that parallel to the Rio Bravo del Norte, and thence with the channel of that river to the gulf of Mexico." 162 U. S., at 39.

Drawing the line "to the Gulf of Mexico" is a far cry from drawing it to a point "three leagues" from the shore. What we do today is quite inconsistent with what a unanimous Court in *United States* v. *Texas, supra,* decided in 1896. What the Court said was not decided until 1850 we now say was decided earlier.

Though the United States and Mexico by the Treaty of Guadalupe Hidalgo established land boundaries between the two countries, Congress never recognized that the Treaty established any boundaries of Texas. In her 1836 statute, Texas not only claimed the three-league belt in the Gulf of Mexico but also much of the territory lying west and north of her present boundaries, including eastern New Mexico which, like the three-league belt, was acquired under the Treaty by the United States. Congress in the 1850 compromise paid Texas $10,000,000 to relinquish its claim to this territory. Yet this payment was regarded by Congress not as purchase price but as settlement of a disputed claim.[11] Accordingly, it was early held that eastern New Mexico, though claimed by Texas, was not brought into the Union by the Joint

---

[11] See Message of President Fillmore to Congress, Aug. 6, 1850, Cong. Globe, 31st Cong., 1st Sess. 1525–1526; letter from Daniel Webster, Secretary of State, to P. H. Bell, Governor of Texas, Aug. 5, 1850, *id.,* at 1526–1527; remarks of Senator Pearce, sponsor of the bill, *id.,* at 1540–1542.

Resolution of 1845 and that the Treaty of Guadalupe Hidalgo did not establish what the Texas boundaries had been at the time of its annexation. *De Baca v. United States,* 36 Ct. Cl. 407 (1901). I cannot understand how the Treaty can be said to have established a seaward boundary when it did not fix the inland boundaries of Texas. The Court does not suggest that all the land claimed by Texas in her 1836 statute and subsequently ceded to the United States in the Treaty of Guadalupe Hidalgo was "territory properly included within, and rightfully belonging to the Republic of Texas" within the meaning of the Joint Resolution of 1845. Yet I can see no basis for deciding that the Treaty, though not recognizing the validity of the western boundary claims of Texas, did establish and fix other Texas boundaries.[12] If

---

[12] The Court suggests, *ante,* note 100, that while the United States pressed Texas' claim to the three-league belt, Texas' claim to eastern New Mexico "obviously was not pressed against Mexico on Texas' behalf." Yet the evidence relied upon by the Court in finding that the United States pressed the Texas claim to a three-league belt supports no such distinction. The statement of President Polk to Congress (H. R. Exec. Doc. No. 60, 30th Cong., 1st Sess. 4, 7) said, "The Congress of Texas, by its act of December 19, 1836, had declared the Rio del Norte to be the boundary of that republic." The instructions to John Slidell (S. Exec. Doc. No. 52, 30th Cong., 1st Sess. 75) read, "The Congress of Texas, by the act of December 19, 1836, have declared the Rio del Norte, from its mouth to its source, to be a boundary of that republic." The Court relies on this evidence in finding that the United States was confirming the claims in the Texas act of 1836, insofar as it related to a seaward boundary but not insofar as the act claimed ownership of all land lying east of the Rio Grande. Since these communications expressly referred to the Texas claim to the territory east of the Rio Grande, from its mouth to its source, which included eastern New Mexico, whereas they were wholly silent on any claim to a seaward territory, the Court's conclusion that the seaward claim was pressed and approved while some territorial claims were not, seems fanciful to me.

the Government was not negotiating on behalf of Texas in acquiring the eastern New Mexico territory; how can it be said to have done so with respect to the seaward boundary claim?

The southwestern boundary of Texas was confirmed in the 1850 Compromise to lie along the Rio Grande "to the Gulf of Mexico." The 1838 Convention had fixed the eastern boundary at "the mouth of the Sabine." Thus, on the two occasions when the United States and Texas negotiated and agreed upon boundaries and when they would have been most likely to have settled the question, no extension of the Texas territory into the Gulf was recognized. The conclusion for me is irresistable that the seaward boundary, *so far as Texas was concerned,* was so inconsequential as to require or receive no settlement. I conclude that in terms of § 4 of the 1953 Act the boundary of Texas reserved for later adjudication when Texas was admitted to the Union was on its seaward side never approved by Congress to be three leagues from shore.

Why then the reference in the Treaty to the "Boundary line" between the United States and Mexico as "three leagues" from land in the Gulf of Mexico?

The Court says that the United States in negotiating the Treaty attempted to follow the 1836 Texas Act. The projet of the Treaty given to Trist did provide for a boundary line commencing "three leagues from the land opposite the mouth of the Rio Grande." [13] But neither it nor the accompanying instructions made any reference to the 1836 Act of Texas. Trist was not told to take the 1836 Act as his guide when it came to seaward boundaries. I can find nothing in the instructions to Trist which relates his duties in negotiating the Treaty to what Texas had claimed in 1836, nor does the Court refer us to

---

[13] S. Exec. Doc. No. 52, 30th Cong., 1st Sess. 86.

any such instruction. To be sure, Trist's predecessor, John Slidell, had been advised by the Secretary of State, Mr. Buchanan, in a letter dated November 10, 1845, that "The Congress of Texas, by the act of December 19, 1836, have declared the Rio del Norte [Rio Grande], from its mouth to its source, to be a boundary of that republic." [14] Trist knew of these earlier instructions. [15] Yet if he followed them literally he would have negotiated a boundary beginning "at the mouth" of the Rio Grande not "three leagues from land opposite the mouth." [16] And, as I have pointed out, the purpose of Trist's mission was much different from that of Slidell's. Slidell was sent to Mexico before the war to settle a boundary dispute. Trist went to obtain the fruits of our conquest of Mexico. The Court concedes that Slidell's instructions demonstrate "total insensitivity to any problem of a seaward boundary." I agree. But I cannot take the additional step that, although our State Department was wholly insensitive to the problem of a seaward boundary, it was nonetheless trying to stand in the shoes of Texas and get Mexico to validate the old boundary claims of Texas. So far as I can deduce, this is sheer speculation.

Much less speculative is the reason advanced in 1875 by Hamilton Fish, Secretary of State.

In 1874 Lord Derby had raised for Great Britain a question with regard to Spain's claim of jurisdiction of

---

[14] *Id.*, at 75.

[15] Papers of Nicholas P. Trist (Library of Congress 1917), Vol. 33, fol. 62071.

[16] These instructions authorized Slidell "to pay five millions of dollars in case the Mexican government shall agree to establish the boundary between the two countries from the mouth of the Rio Grande, up the principal stream to the point where it touches the line of New Mexico; thence west of the river along the exterior line of that province, and so as to' include the whole within the United States. . . ." S. Exec. Doc. No. 52, 30th Cong., 1st Sess. 78.

two leagues from the Spanish coast.[17] Hamilton Fish replied on January 22, 1875, as follows: [18]

". . . I have the honor to inform you that this Government has uniformly, under every administration which has had occasion to consider the subject, objected to the pretension of Spain adverted to, upon the same ground and in similar terms to those contained in the instruction of the Earl of Derby.

"We have always understood and asserted that, pursuant to public law, no nation can rightfully claim jurisdiction at sea beyond a marine league from its coast.

"This opinion on our part has sometimes been said to be inconsistent with the facts that, by the laws of the United States, revenue-cutters are authorized to board vessels anywhere within four leagues of their coasts, and that by the treaty of Guadalupe Hidalgo, so called, between the United States and Mexico, of the second of February, 1848, the boundary line between the dominions of the parties begins in the Gulf of Mexico, three leagues from land.

"It is believed, however, that in carrying into effect the authority conferred by the act of Congress referred to, no vessel is boarded, if boarded at all, except such a one as, upon being hailed, may have answered that she was bound to a port of the United States. At all events, although the act of Congress was passed in the infancy of this Government, there is no known instance of any complaint on the part of a foreign government of the trespass by a commander of a revenue-cutter upon the rights of its flag under the law of nations.

---

[17] H. R. Exec. Doc. No. 1, Pt. 1, 44th Cong., 1st Sess. 641.
[18] *Id.*, at 649–650.

"In respect to the provision in the treaty with Mexico, it may be remarked that it was probably suggested by the passage in the act of Congress referred to, and designed for the same purpose, that of preventing smuggling. By turning to the files of your legation, you will find that Mr. Bankhead, in a note to Mr. Buchanan of the 30th of April, 1848, objected on behalf of Her Majesty's government, to the provision in question. Mr. Buchanan, however, replied in a note of the 19th of August, in that year, that the stipulation could only affect the rights of Mexico and the United States, and was never intended to trench upon the rights of Great Britain, or of any other power under the law of nations."

The Act referred to was that of March 2, 1799 (1 Stat. 627), which provided in § 54 that it shall be lawful for our collectors, naval officers, inspectors, and officers of revenue cutters to board ships bound to the United States "within four leagues of the coast" for the purpose of controlling or preventing smuggling.[19]

That this was the purpose gains collateral support from a series of treaties concluded by Mexico in the latter half

---

[19] Chief Justice Marshall writing for the Court in *Church* v. *Hubbart,* 2 Cranch 187, 235, said:

"In different seas and on different coasts, a wider or more contracted range, in which to exercise the vigilance of the government, will be assented to. Thus in the channel, where a very great part of the commerce to and from all the north of Europe, passes through a very narrow sea, the seizure of vessels on suspicion of attempting an illicit trade, must necessarily be restricted to very narrow limits, but on the coast of *South America,* seldom frequented by vessels but for the purpose of illicit trade, the vigilance of the government may be extended somewhat further; and foreign nations submit to such regulations as are reasonable in themselves, and are really necessary to secure that monopoly of colonial commerce, which is claimed by all nations holding distant possessions."

of the nineteenth century with China,[20] the Dominican Republic,[21] El Salvador,[22] France,[23] Germany,[24] the Netherlands,[25] Norway and Sweden,[26] and the United Kingdom,[27] which state that the "three league" belt (or at

[20] *"Article XI.* . . . The two contracting parties agree upon considering a distance of three marine leagues, measured from the line of low tide, as the limit of their territorial waters for everything relating to the vigilance and enforcement of the customs-house regulations and the necessary measures for the prevention of smuggling." 1 Laws and Regulations on the Regime of the High Seas (United Nations Legislative Series) 147.

[21] *"Article 15.* In all that concerns the police regulations of the ports, the loading and discharging of ships, and the custody of the merchandise and effects, the subjects of the two Powers shall be subject to the local laws and ordinances.

"With respect to Mexican ports, under this title are comprehended the laws and ordinances promulgated, or that may be promulgated in the future, by the federal Government, as also the dispositions of the local authorities within the limits of the sanitary police.

"The contracting parties agree to consider as the limit of the territorial jurisdiction on their respective coasts the distance of twenty kilometres, counted from the line of lowest tide. Nevertheless, this rule shall only be applied for the carrying out of the custom-house inspection, the observance of the custom-house regulations, and the prevention of smuggling; but on no account shall it apply to the other questions of international maritime law.

"It is equally understood that each one of the contracting parties shall not apply the said extension of the limit of jurisdiction to the ships of the other contracting party, except when this contracting Power proceeds in the same manner with the ships of the other nations with which it has treaties of commerce and navigation." *Id.,* at 153, 154.

[22] *"Article XXI.* It is agreed between the High contracting parties that the limit of sovereignty in the territorial waters adjacent to their respective coasts comprises a distance of twenty kilometres, counted from the line of lowest tide: but this rule shall apply only as regards the exercise of the right of police, for the execution of customs ordinances and the prevention of smuggling, and in respect of matters concerning the security of the country. In no case shall such limit be applicable to other questions of international maritime law." *Id.,* at 156.

114

times a broader one) was being used for certain limited reasons of law enforcement.

These treaties reflect what Hamilton Fish as Secretary of State said about the Treaty of Guadalupe Hidalgo and

[23] *"Article 15.* . . . The contracting parties agree to consider as the limit of territorial sovereignty on their respective coasts a distance of twenty kilometres from the line of lowest tide.

"At all times this rule shall be applicable only for exercising customs control, for executing customs ordinances, and for the regulations against contraband, and shall never be applied, on the other hand, in all other questions of international maritime law. It is likewise understood that each of the contracting parties will apply said extent of the limit of sovereignty to the vessels of the other contracting party only provided that said contracting party acts likewise toward vessels of other nations with which it has made treaties of commerce and navigation." *Id.,* at 169, 170.

[24] *"Article VIII.* . . . The two contracting parties agree to consider as the limit of maritime jurisdiction on their coasts, the distance of three sea leagues, reckoned from low-water mark. Nevertheless, this stipulation shall not have effect except as regards the coast-guard and custom-house service, and the measures for preventing contraband trade. As regards all other questions of international law it shall have no application. It is, however, to be understood that the aforesaid extension of maritime jurisdiction shall not be made applicable by one of the contracting parties as against the vessels of the other, unless that party shall treat in the same manner the vessels of all other nations with which it may have treaties of commerce and navigation." *Id.,* at 170.

[25] *"Article 6.* The high contracting parties agree to consider, as a limit of their territorial waters on their respective coasts, the distance of twenty kilometres reckoned from the line of low-water mark. Nevertheless this stipulation shall have no effect, except in what may relate to the observance and application of the custom-house regulations and the measures for preventing smuggling, and can in no way be extended to other questions of international maritime law." *Id.,* at 171.

[26] *"Article VII.* . . . The two contracting parties agree to consider as the limit of territorial seas on their respective coasts for the purpose of applying customs regulations and measures necessary for the prevention of smuggling, the distance of three marine leagues reckoned from low-water mark. It is understood, however, that with

its "three league" provision. They show a practice of exercising extraterritorial regulation beyond the usual three-mile limit with respect to customs and smuggling. It is true that the Treaty of Guadalupe Hidalgo speaks in terms of "boundary." But, if it meant "boundary" in the technical property sense, it would mark a line that separated the *territory* of the United States and Mexico and established a territorial claim good against all comers. Our State Department from the beginning insisted that was not intended. When Great Britain protested in 1848 that the Treaty of Guadalupe Hidalgo did not respect the three-mile limit which "is acknowledged by international law and practice as the extent of territorial jurisdiction over the sea that washes the coasts of states," Secretary of State Buchanan's answer (which, as we have noted, Hamilton Fish referred to in his communication of January 22, 1875) was as follows: [28]

> "In answer I have to state, that the stipulation in the treaty can only affect the rights of Mexico and the United States. If for their mutual convenience it has been deemed proper to enter into such an arrangement, third parties can have no just cause of

respect to other questions of international maritime law, this extension of territorial seas shall not be applied by one of the contracting parties to the vessels of the other, unless that party shall apply it equally to vessels of other nations with which she has concluded treaties of commerce and navigation." *Id.,* at 171–172.

[27] *"Article IV.* . . . The two Contracting Parties agree to consider as a limit of their territorial waters on their respective coasts, the distance of three marine leagues, reckoned from the line of low-water mark. Nevertheless, this stipulation shall have no effect, excepting in what may relate to the observance and application of the custom-house regulations and the measures for preventing smuggling, and cannot be extended to other questions of civil or criminal jurisdiction, or of international maritime law." *Id.,* at 172.

[28] 1 Moore, Digest of International Law (1906), 730.

116

complaint. The Government of the United States never intended by this stipulation to question the rights which Great Britain or any other power may possess under the law of nations."

That has consistently been our construction. I have already referred to what Secretary Fish said in 1875. When Mexico in 1935 undertook to extend the breadth of Mexican territorial waters from three to nine miles,[29] our Ambassador Josephus Daniels on instructions from the State Department protested, reserving "all rights of whatever nature so far as concerns any effects upon American commerce from enforcement of this legislation." [30] And when Mexico in reply [31] referred to the Treaty of Guadalupe Hidalgo as justifying her claim to nine miles, the State Department reiterated among other things our consistent position that the treaty provision extending the "boundary" into the Gulf for three leagues was included to give the two nations jurisdiction to that distance at that particular point "to prevent smuggling." [32]

It seems apparent from this history that the United States in negotiating the Treaty of Guadalupe Hidalgo was far from determining that the metes and bounds of our property on the seaward side of the Gulf ran to three leagues. The three-league provision in purpose and presumed effect had quite a different aim. It had no aim to assert derivatively a title that Texas had claimed. Its aim was merely to mark a zone where, so far as the two contracting parties were concerned, our law enforcement agencies could maintain effective patrols. If this history shows nothing else, it shows that the United States had a national interest in having the three-league belt recog-

---

[29] 1 Hackworth, Digest of International Law (1940), 639.

[30] 99 Cong. Rec. 3623.

[31] Ibid.

[32] Id., at 3624.

nized for its own purposes, whereas Texas up to the time oil was discovered offshore placed no value whatsoever on a seaward boundary. For me the argument becomes too thin to say that the United States, though nominally negotiating on her own behalf, was claiming the three-league maritime belt on behalf of Texas.

If we acted today with the precision and meticulous care which is demanded in title disputes, we could not, I think, say that the United States in the Treaty of Guadalupe Hidalgo recognized or approved the Texas claim that the territory of Texas extended three leagues from shore.

Yet if we are to decide these cases by substandards (lessening the requirements of proof as we should do if Congress intended to grant whatever the parties fairly claimed), then I agree with MR. JUSTICE BLACK that the discrimination in favor of Texas and against Louisiana, Alabama, and Mississippi is quite unjustified.

If the southeast corner of Texas was three leagues offshore, it is difficult for me to see how the southwest corner of Louisiana was not at the same point. From the beginning the United States and Spain fixed their corner west of the Mississippi "on the Gulph of Mexico, at the mouth of the river Sabine, in the sea." 8 Stat. 254. If we move the Texas boundary out three leagues, it is hard to see why Louisiana's does not accompany it. It has long been recognized that a part of Louisiana's border is "a water boundary" that extends "to the open sea or Gulf of Mexico," Louisiana v. Mississippi, 202 U. S. 1, 43, and includes "the deep water sailing channel line as a boundary." Id., at 44.

The enabling Act authorizing the people of the Territory of Orleans to form Louisiana described the territory as running "to the gulf of Mexico; thence bounded by the said gulf . . . including all islands within three leagues of the coast." 2 Stat. 641. The boundaries described

in the Act admitting Louisiana to the Union are similarly described as "to the gulf of Mexico . . . thence bounded by the said gulf . . . including all islands within three leagues of the coast." 2 Stat. 701, 702.

As respects Mississippi, Congress in the Enabling Act (3 Stat. 348) provided that the territory included in the new State would run from a specified point on the Gulf of Mexico, "westwardly, including all the islands within six leagues of the shore." This was the boundary description used since George III of Great Britain described West Florida as "bounded to the southward by the Gulf of Mexico,. including all islands within six leagues of the coast." [33]

Alabama when a territory had two of its boundaries described as "thence due south to the Gulf of Mexico, thence eastwardly, including all the islands within six leagues of the shore, to the Perdido river." 3 Stat. 371. This language was repeated in the Enabling Act. 3 Stat. 489.

The United States concedes that, so far as Louisiana, Mississippi and Alabama are concerned, all the submerged lands between the mainland and the islands are sufficiently enclosed to constitute inland waters that passed to the State on its entry into the Union. *Pollard v. Hagan*, 3 How. 212. It further concedes that these States have rights to the submerged lands within three miles of the islands under the ordinary three-mile rule.

If we were to require the degree of proof of ownership which is ordinarily required in title disputes, I would agree that neither Louisiana, Alabama, nor Mississippi has met the burden of proof. But if standards and requirements

---

[33] American State Papers, 5 Public Lands 756. Both East and West Florida were ceded to the United States by Spain in 1819. 8 Stat. 252, 254.

as lax as those used to grant Texas three leagues from shore are sufficient for her, they should be sufficient for these other three States.

The heart of the Texan claim is that the United States and Mexico recognized that there was a three-league maritime belt which each would respect and that this was done in recognition of the validity of the claims contained in the 1836 statute of Texas. This belt was called a "boundary"; but, as I have tried to demonstrate, it was not a territorial claim but only a demarcation of zones where the parties' respective law enforcement activities would be recognized and approved. The Gulf presents peculiar problems due to its shallow coast. The shallowness of its waters is well documented and our Government was well aware of this condition in 1848.[34] These are the persuasive facts behind the creation of the three-league belt by the Treaty of Guadalupe Hidalgo and by Mexico in the other treaties concerning the Gulf which she negotiated with other nations.

If the policy of measuring the zone of the United States as "three leagues" into the Gulf off the shore of Texas is to give Texas property rights to the submerged lands in that zone, the beneficiaries of that concern should be all our Gulf States. At best the language used to describe the seaward territories of Louisiana, Alabama, and Mississippi is ambiguous. The words "to the Gulf of Mexico . . . including all of the islands" within certain designated leagues of the shore can reasonably mean that the "boundary line" is marked by the islands. There is difficulty in that construction. Yet it is for me no more difficult than the method we use to give Texas a territorial claim in the same belt. All the States on the Gulf

---

[34] See 7 British and Foreign State Papers 984; 9 British and Foreign State Papers 828–829; 18 British and Foreign State Papers 1403.

should be given the same benefit of the doubts that have been resolved in favor of Texas. The claim of Florida, as shown in *United States* v. *Florida,* decided this day, *post,* p. 121, is fully established by the standard I would ask Texas to meet. If we are to relax the standard of proof for the benefit of Texas, we should do so for all these claimants. In that posture, the claims of each of the other Gulf States which have gone "long-unchallenged," as shown by MR. JUSTICE BLACK, are as clear as those of Texas.